**ROSSI et al. v. UNITED STATES.**

**No. 6238.**

Circuit Court of Appeals, Ninth Circuit.

April 13, 1931.

Rehearing Denied June 1, 1931.

WILBUR, Circuit Judge, dissenting.

Verner R. Clements, of Lewiston, Idaho (Marcus J. Ware, of Lewiston, Idaho, of counsel), for appellant Rossi.

Turner, Nuzum & Turner, of Spokane, Wash., and O. J. Bandelin, of Sandpoint, Idaho, for appellant Weniger.

Harry H. Parsons, of Missoula, Mont., for appellants Armani and others.

H. E. Ray, U. S. Atty., and W. H. Langroise, Sam S. Griffin, and Ralph R. Breshears, Asst. U. S. Attys., all of Boise, Idaho.

Before RUDKIN, WILBUR, and SAW-TELLE, Circuit Judges.

RUDKIN, Circuit Judge.

This is an appeal from a judgment of conviction under an indictment charging a conspiracy to violate the National Prohibition Act. The principal assignment of error challenges the sufficiency of the evidence to support the verdict and judgment.

The record discloses an interesting chapter in the history of vice and crime in Northern Idaho during the period covered by the indictment, and, if we were privileged to administer justice on general principles, without regard to the orderly, established rules of law, the conviction of many of the appellants might well be sustained, because, without doubt, they openly and habitually violated the National Prohibition Act during the period in question. But we have no such license or liberty, and the judgment of the court below cannot be sustained unless the charge laid in the indictment is supported by some substantial evidence. The charge is that a large number of persons, including the municipal officers of the city of Wallace, in the state of Idaho, and the sheriff of Shoshone county, in the same state, together with certain of his deputies, conspired and agreed to possess, transport, sell, and manufacture intoxicating liquor in violation of the National Prohibition Act. It will thus be seen

that the municipal officers are charged with a conspiracy to commit an offense against the United States, that is, to possess, transport, sell, and manufacture intoxicating liquor in violation of law.

As we view it, there is not a particle of evidence in the record tending even remotely to establish or prove any such conspiracy. There is no evidence of any kind that any of such officers agreed with any person or persons that intoxicating liquor should be possessed, transported, sold, or manufactured, and there is no evidence that any of such officers aided, abetted, counseled, commanded, induced, or procured the commission of any such crimes. The case made against the municipal officers was simply. this, and nothing more: From time to time these officers collected tribute from bootleggers, gamblers, prostitutes, and perhaps other law violators within the city, sometimes openly and sometimes by subterfuge, but always for the benefit of the municipality.

From such a course of conduct, an agreement on their part not to prosecute the persons so contributing might be inferred; but there was no evidence of any agreement, express or implied, on the part of the officers to protect any offender from prosecution for violating the National Prohibition Act. With the federal government the offenders took their chances. No obligation rested upon the municipal or county officers to prosecute offenses against the United States, and they were guilty of no crime by merely refraining from so doing. In other words, inaction on their part was not an offense against the United States.

In this connection it is well to remember that the object of the conspiracy, if any existed, was largely accomplished, and that, if the municipal or county officers are guilty of the offense charged in the indictment, they are likewise guilty of the offenses of possessing intoxicating liquor, of transporting intoxicating liquor, of selling intoxicating liquor, of manufacturing intoxicating liquor, of maintaining common nuisances, of running gambling resorts, and of keeping bawdy houses. Some of these, of course, are not offenses against the United States, but they are offenses none the less. And to say that municipal officers who demand or accept tribute from lawbreakers within the city, in the form of a tax, for the benefit of the municipality, are parties to every offense committed within the city, is a non sequitur, a conclusion we are unwilling to adopt.

Again, to say that you aid or promote a business by merely taxing it is a novel proposition, to say the least. The power to tax involves the power to destroy, and, if pressed far enough, will accomplish that result. Furthermore, it is not a crime to tax what is forbidden. As said by Mr. Justice Holmes in United States v. Stafoff, 260 U. S. 477, 480, 43 S. Ct. 197, 199, 67 L. Ed. 358: "Of course Congress may tax what it also forbids." And again, by the same learned judge, in United States v. Sullivan, 274 U. S. 259, 263, 47 S. Ct. 607, 71 L. Ed. 1037, 51 A. L. R. 1020: "We see no reason to doubt the interpretation of the Act, or any reason why the fact that a business is unlawful should exempt it from paying the taxes that if lawful it would have to pay." And, if Congress may tax what it also forbids, we know of no reason why a state or municipality may not do the same. Whether such a tax was authorized by the laws of the state, or whether the collection of such a tax was a mere usurpation of authority on the part of the municipal officers, does not concern us, because we have nothing to do with the violation of state laws.

For the reasons thus briefly stated, we are of opinion that the charge of conspiracy against the municipal officers utterly failed for want of proof; and to say that all the numerous, independent competing bootleggers in that section were conspiring together for any purpose, lawful or unlawful, is a perversion of the facts, a mere figment of the imagination.

There was an entire failure of proof to connect the sheriff with any conspiracy, even if one existed, for the reason stated in Weniger v. United States, 47 F.(2d) 692, decided by this court February 24, 1931, where the same testimony was relied on to connect him with another conspiracy in a different part of his county.

For error in refusing to direct a verdict of not guilty at the close of all the testimony, the judgment of the court below is reversed, and the cause is remanded for a new trial.

WILBUR, Circuit Judge (dissenting).

In stating the case before this court for review on appeal, I will do so in the language of the government's brief, with a few slight changes necessary to conform that statement to the facts shown by the transcript, and in so doing will occasionally eliminate adjectives and inferences suggested in this statement. Because of these changes in

the statement, I do not put the same in quotations:

Herman J. Rossi, who is mayor of the city of Wallace, Idaho, and took office as such in May, 1929, R. E. Weniger, who was sheriff of Shoshone county, Idaho, in which is situated the city of Wallace, its county seat, during 1927 to 1930, Mouge Tapper, Harry Brown, Jack Jones, Wally Norman, Mike Savich, John Barnardy, Tony Armani, Joe Carboneau, Jack Chisholm, E. C. Florin, Matt Jurkovich, A. F. Lieb, Cecil Murphey, Paul Miller, M. W. Paddock, and Mike Pavelich, all of whom are appellants herein, together with twenty-eight others, including W. J. Bailey, chief of police of Wallace, Charles Bloom and Albert Chapman, deputy sheriff, and W. H. Herrick, mayor of Wallace from May 9, 1927, to May, 1929, were indicted in the district of Idaho, Northern division, on November 25, 1929, charged with conspiracy entered into at Wallace, Idaho, from on or about April 1, 1927, to the date of indictment, to possess, transport, sell, and manufacture intoxicating liquor, to wit, beer, wine, and whisky, and to maintain in said Wallace common nuisances under the National Prohibition Act. Seventeen overt acts were alleged, in substance that Bailey filed with one Leighty on dates in 1927 complaint charging defendant Jurich with speeding, defendant Louviers with disturbing the peace, and defendant Whalen with disorderly conduct; that in 1927 defendant Calhoun paid the city clerk $25; that various defendants, naming them, at various named dates, possessed and sold whisky at designated places in Wallace; and that other defendants, at named times in 1927 and 1929, paid moneys to the city clerk or city treasurer. Between December 10, 1929, and December 23, 1929, all defendants entered pleas of not guilty. Thereafter, on April 21, 1930, without withdrawal of plea or permission of court, appellant Weniger filed a plea of former jeopardy, which was demurred to and submitted on June 16, 1930, at the opening of the trial, when the court reserved ruling and subsequently overruled the plea.

The cause had, on May 15, 1930, been set for trial upon the pleas, to begin on June 16, 1930. On June 3rd, several defendants, without withdrawal of pleas or permission of the court, filed demurrers and motions to quash, which the government moved to strike. On the day of trial, June 16, 1930, some defendants, including appellant Rossi, without withdrawal of pleas or permission of the court, filed demurrers, request for bill of particulars, and motion to quash. Notwithstanding,

the court at that time permitted withdrawal of pleas, considered the demurrers and motions, denied them, and, pleas of not guilty being again entered, the trial proceeded in accordance with the original setting, continued from day to day thereafter until the jury returned its verdict on June 21, finding all defendants (except eight for whom the court instructed a verdict) guilty as charged. The record shows no exceptions reserved to the rulings of the court on the demurrers, motions to quash, or motions for bill of particulars. Motions in arrest of judgment and new trial were over-ruled. No exception was reserved. Judgments were pronounced varying as to different defendants from thirty days in the county jail to fifteen months in the penitentiary. Though petition for appeal of Rossi and Weniger and order allowing appeal were filed and entered June 23, 1930, amended assignment of error was not filed until July 23 and August 12, 1930. The other appellants filed petition for appeal and order allowing appeal July 5, 1930. Assignments of error were filed July 25, 1930.

The city of Wallace, Shoshone county, Idaho, the county seat, wherein was maintained the office of Sheriff Weniger, an appellant, was at the time in May, 1927, that Herrick (convicted but not appealing) assumed office as mayor, "wide open" with respect to liquor selling, prostitution, and gambling. While there were places operated as legitimate cigar and grocery stores, rooming houses, and hotels, there were many others designated as cigar or grocery stores, but in reality combination gambling and liquor joints, where liquor was openly sold over the bars maintained therein, or houses of prostitution and liquor joints. And these flourished, unmolested by, though known to, the Sheriff Weniger, the Mayor Herrick, and his successor in office, appellant Rossi, and the chief of police through both administrations Bailey, except to the extent of levying tribute upon them, until the return of the indictment herein in November, 1929. The details, as shown by evidence, supporting this general statement, follow:

Herrick became mayor on May 9, 1927, and continued as such until May, 1929, when appellant Rossi took office. He had been county assessor. Immediately he consulted Mr. Hull, an attorney, who had been city attorney for Mullan, Idaho, and inquired how Mullan was "getting by," and was informed that, under the guise of an occupation license ordinance, Mullan was thought to be collecting licenses from bootleggers and unlawful occupations, that a revenue ordinance would

be invalid, and payments were made in Mullan voluntarily. He was not advised that he could regulate prostitution, gambling, and liquor by such a method. Likewise he consulted Mr. Wayne, city attorney, about occupation licenses, received similar advice, but did not inquire about how to regulate prostitution, gambling, bootlegging, or liquor dealing. In fact, at this time, since 1916, and throughout the Rossi administration also, the city ordinances forbade gambling. Then, knowing that the liquor places were operating as in the "wide open" nearby towns of Kellogg and Mullan, he discussed the liquor situation with Sheriff Weniger, and was advised that Weniger would close up liquor places in the balance of the county if the mayor would close up the town of Wallace. Within four days of taking office the mayor's attitude of willful withholding of any action toward changing conditions, known to him, was published to violators of the Federal Prohibition Act and evidenced by the collection of payments by concealed methods and false entries in police records.

Bailey, convicted but not appealing, was chief of police, and continued as such in appellant Rossi's administration. Leighty was, and continued through Rossi's administration to be, police judge, city clerk, and justice of the peace; Keating, city treasurer, Herrick, the mayor, talked with Leighty, police judge and city clerk, and told him he had consulted the city attorney of Mullan as to the methods they were pursuing, and instructed the chief of police, Bailey, to collect money from various people, and he wanted it to be raised by Bailey, Leighty, and himself. Leighty testified that Herrick said collections were to be made from gamblers, prostitutes, soft drink places, or where slot machines were operated. However, he also testified, there were during this period places in Wallace engaged exclusively in the sale of soft drinks, and from these no collections were made; there were also legitimate rooming houses, hotels, cigar stores, and pool halls, and they were not collected from; and Herrick himself frankly admitted that the collections were from liquor law violators; while the evidence shows that the payers in practically every instance during the whole period of the conspiracy were liquor dealers.

As first inaugurated, the system of collections was similar to a method pursued in 1908, prior to the prohibition law, but not in vogue within the past several years. Bailey would collect the money, make out a form of complaint charging the payer, or some one for him, or a fictitious name or the place operating, with an ordinance violation, such as speeding, improper parking, drunkenness, etc., and file it with Leighty as police judge; no warrant of arrest would be issued, nor any one arrested in fact, nor was there any appearance or judgment, yet an entry would be made upon the police docket to the effect that the person had been arrested, entered a plea of guilty upon personal appearance before Leighty, and judgment entered for a fine and costs, and the same paid. The aggregate of fine and costs would equal the amount which Bailey had collected from liquor dealers, houses of prostitution, and gamblers, and which he paid over to Leighty, who would later remit to the city treasurer, Keating, and report to the city council in his monthly reports as clerk this amount as fines, forfeitures, and costs. In some instances an amount thus collected would be credited on the police docket to payment of a fine and costs of another person who had in fact been arrested and fined for an offense actually committed. The reports of the chief of police and city clerk show the remarkable increase in police court revenue after the institution of this system; prior thereto in January, 1927, fines, forfeitures, and costs totaled $53.20; in February, $10.46; March, $67.10; April, $191.20; subsequently the totals were May, 1927, $576; June, $652; July, $728; August, $700; September, $681; October, $674.94; November, $827; December, $690; January, 1928, $672; February, $576; March, $601; April, $716. Thereafter, collections having been temporarily discontinued because of fear of federal prosecution to be resumed in May, 1929, under appellant Rossi under the guise of park rentals as hereinafter set forth, fines, costs, and forfeitures fell off to $183.65; $167, $233, $145, $20, $50, $140, etc., in consecutive months. In May, 1929, and thereafter until October, 1929, the revenues were increased from $160 to $300 per month, at which latter time these ceased because of federal investigation also.

After two months of false police court docket entries, the system of collections changed, just as again in appellant Rossi's administration it was again changed. In June or July, 1927, Herrick made an arrangement with Leighty, Bailey, and the gamblers, prostitutes, and dealers in liquor that, instead of Bailey collecting, and filing false charges and thus making some record, the dealers should pay directly to Leighty, city clerk, and no record should be kept. Bailey was to see that the payers came in (and on one occasion, when Bailey was on vacation, the traffic officer, Conn, was assigned this du-

ty), and Leighty, Bailey, and Herrick checked up to see who did and who did not pay. At the end of the month, Leighty reported to Herrick the total amount paid in, and Herrick made an arbitrary distribution of the amount under the heads of fines, forfeitures, and costs, and instructed Leighty to, and the latter did, report on his monthly reports under these headings. Leighty kept a private record of payments. The individual payments varied, depending upon whether the payer was engaged in one only, or more, of the occupations of bootlegger, gambler, or prostitute. After the May, 1928, collections, payments temporarily stopped because one of the councilmen discovered what was going on and federal prosecution was feared, to be resumed later in 1929 under the guise of park rentals.

When appellant Rossi was inducted into office, he reappointed Bailey as chief of police; Leighty remained as clerk, police judge, and justice of the peace; Keating remained as treasurer, some of the council were holdovers, and Weniger was still sheriff. Rossi, a reform candidate, knowing of conditions, but deeming at least gambling and prostitution a necessity in Wallace, Bailey was instructed to see that the prostitutes had health certificates, and was not instructed to investigate liquor violations. Bailey did not do so. C. B. Steuenberg, special prohibition investigator for the government of the United States, testified that defendant Rossi made the following statement to him, to wit:

"Mr. Rossi stated that he had publicly criticised the Herrick administration in opposing a proposed lighting system, and also open gambling and especially the money slot machines. That a number of his friends had induced him to become a candidate for the mayor on a clean-up ticket. That he did so and was elected. That immediately after he was installed in office he closed the slot machines in Wallace and later closed the gambling, or greater part of it, but after he was elected and before he was installed that he called a meeting of the councilmen-elect in his office on two or three occasions and explained to them a plan that he had inaugurated for the purpose of collecting revenues from gamblers and houses of prostitution. That the plan was to charge twenty dollars a month for the landladies in the houses of prostitution and forty dollars a month for gambling.

"That there was no objection made by any of the members of the council to that plan. That he had a right to collect revenue and that he had a right to collect revenue and

regulate the underworld on account of the extra police protection that it was necessary to take care of it, but that no extra policeman had been put on. That he and Chief of Police Bailey personally notified the parties who were supposed to pay that they should make these payments to City Treasurer Keating. That at the time they notified them they did not state that this license gave them the authority to sell liquor. Neither did they state that they did not prohibit them from selling liquor. That the chief of police was not instructed to investigate these places to see if liquor was being sold or the law violated, but that the chief did investigate the houses of prostitution to see that the inmates had their medical certificate. That he wanted to be of any assistance he could to the Government and showed us some receipt books covering park rent that he said covered all the revenues illegally collected under his administration. That in a town like Wallace that he thought it necessary to allow a certain amount of gambling and to have prostitutes. That when Mr. Keating made his first monthly report of revenues collected as park rent that Councilman Towles wanted to know where this revenue was derived from, as he was in charge of the parks and knew of no rent being collected. When he was informed that it was collected from gambling houses and houses of prostitution, Councilman Towles objected to it being charged as park rent, and later resigned from the council on that account. That he had intended to discontinue the service of Chief of Police Bailey on account of graft charges, but that he had retained him at the personal request of Julius Johnson. That he had investigated the charges against Chief of Police Bailey and found them unfounded. That the liquor question was left up to Webb and Johnson at their request. That he told them that the city was not in a position to handle liquor violators because they could not get over a twenty-five-dollar fine and that Webb and Johnson said, 'We will look after the liquor.' That he knew Austin McPhee and knew him to be a bootlegger.

"He said as far as liquor was concerned he had left it with the Federal officers at their request, that is with Johnson and Webb, who were then Federal Prohibition Agents and had been for a number of years prior."

Nevertheless, the same dealers and the same places continued to operate for the sale of liquor, and every place paying park rentals dealt in liquor, and had previously made payments during the Herrick collections. Rossi approached Keating, the treasurer, and

told him that people sent by Bailey, the chief, would come to him and make payments. Who would come and what the payments were for, Keating was not advised; at his request he was furnished triplicate receipts, not made up by him, which purported to receipt for payment of rental for one month of a portion of the city park. Rossi and Bailey notified the people to go to the city treasurer and pay, and they did so. Keating did not discuss with them occupancy of the park, did not allot any space in the park to them, and no rent was in fact being collected for park occupancy. In July, 1929, Keating thought payments were to be stopped, and did stop, but Rossi and Bailey directed him to continue with the girls—the sheriff had closed gambling, though liquor activities did not cease—and Bailey directed the people to resume payments. The last payment was received in October, 1929, because federal investigators were in the district, told them they might get in bad, and Keating presented the matter to the council, which ordered collections stopped.

During the period covered by the conspiracy charged, it was recognized and agreed by the dealers in liquor in Wallace that local officials' co-operation was essential, or at least desirable, and was obtainable. Such officials patronized the places for the purpose of procuring liquor, visited the places, purposely refraining from interference. Weniger interviewed Rogers and Cooper, government agents, and within a few minutes thereafter they were unable to buy liquor in places they formerly had bought from. Weniger also accused McGill of being a government stool pigeon, and told him to stay out of the liquor joints.

Tony Armani, one of the appellants, operated the Cœur d'Alene Fruit Store, and desired to dispose of some wine. Therefore he discussed the matter with Leighty, telling Leighty he had some wine he wanted to dispose of, and as soon as he got through with that he would not handle it. He thereupon made payments for the months of October, November, and December, 1927. He was convicted and sentenced to four months' imprisonment.

Claude Ralls, also known as Mutt Ralls, now in the penitentiary for liquor violations, operated in the Herrick and Rossi administrations in 1927, 1928, and 1929. He had cigars, slot machines, and liquor. He bought as much as $800 worth of liquor from McPhee, a defendant not on trial, of the Samuels Hotel Bar. Bailey was occasionally in

his place, and in the spring of 1927 collected from him twice, and then instructed him to pay Judge Leighty, and he did so. He was never raided or arrested for liquor violations by city or county officials. Leighty bought liquor at Ralls' place, and the police docket shows fictitious assessments of fines against him once under the name of Claude Rowan.

John Bernardy, an appellant, was operating what purported to be a fruit store, three blocks from the courthouse, where was Sheriff Weniger's office, and two and one-half blocks from the city hall. It was admitted that he was selling liquor there. He was in Wallace during 1927, 1928, and 1929, and paid under instructions from Herrick, both under the fictitious fine system and to the city clerk, under the impression that this gave him protection from the city police, of which Bailey was chief during both administrations. He was convicted and sentenced to two months' imprisonment.

Appellant E. C. (Mickey) Florin and defendant William Fahles were engaged in operation of a bar and gambling joint at Fahles Hotel during both the administration of Herrick and Rossi, and payments made both to Leighty, and, as park rental, to Keating, some payments by Florin and some by Fahles. In 1927 and 1928 both were buying beer for this business in wholesale lots from Desbro. Drinks and bottles of beer and whisky were bought over the bar in February, 1928; March, 1928; July, 1928; the fall of 1928; the Christmas seasons of 1928 and 1929; and April, 1929. The amount collected for March, 1927, was $60, indicating two types of payment, one for gambling and another. It was not a house of prostitution. Both were convicted and Florin sentenced to four months' imprisonment.

The Pastime was operated as a cigar store and barroom during 1927, 1928, and 1929. Appellants Matt Jurkovich, also known as Matt Jurick, and Nick Pavelich were its proprietors, associated with defendant Tom Kranick (not tried) and Crodin. Leighty, during the three years of the conspiracy, drank there. Keating knew the proprietors, Bailey was in the place and aware of its business, and, when complaint was made to him about booze peddling there, said: "If there was a party wanted to buy booze why didn't he go to some white man; there is enough of them in town without patronizing Bohunks." It was one of the places patronized by Anthony McGill, and out of which he was ordered to stay by Sheriff Weniger, who suspected McGill of being a gov-

ernment stool pigeon, and one of the places at which Cooper bought liquor in 1929 and from which he ordered immediately after his identity as a government agent became known to Sheriff Weniger. There were cigars in front and a bar in the rear. Payments for permit to operate were made under the fictitious fine system and to Leighty, and it continuously operated as a liquor joint during the period of the conspiracy. Leighty bought drinks in 1927; in May, 1929, Desbro wholesaled beer there; during 1928 and 1929 English bought moonshine whisky there; in 1928 McGill bought whisky in wholesale quantities there; Collins bought drinks and a bottle of whisky there in March, 1928, and described it as an open barroom. Morgan bought drinks of whisky in February and March, 1928. Cooper bought drinks there in April and June, 1929. Johnson and Webb raided the place for liquor in March, 1929. The McKinneys were familiar with the place, and bought drinks there during 1927, 1928, and 1929. Jurkovich and Pavelich were sentenced to four months' imprisonment.

Appellant Wally Norman was associated with defendant Joe Calhoun in the Last Chance Bar at 210 Sixth street, for which A. F. Lieb, who will be mentioned again in connection with the Williams Corner saloon, paid light and water, from September, 1927, to July, 1929. Payments were made by Norman or Calhoun under the fictitious fine system and to the city clerk. During the three years it maintained a bar, over which it served liquor, Leighty bought drinks there during this period; Desbro wholesaled beer there in 1927; Defferding bought beer there of Norman in 1928; Morgan and Collins bought, and saw sold, whisky there by Norman and Calhoun over the bar in February and March, 1928, and Norman was operating a liquor joint in Wallace in September, 1929. Norman and Calhoun were sentenced to four months' imprisonment.

Appellants A. F. (Al) Lieb and Mike Savich, together with Chauncey Miller, were associated in a place known as Williams' Corner. Lieb was also paying light and water during 1927, 1928, and 1929 for the Last Chance above mentioned. Williams Corner and appellants operated a liquor joint during the years of the alleged conspiracy, made payments under both the fictitious fine system and to the city clerk, operated an open bar, known to Keating, over which drinks of liquor were sold. Leighty during the period was a regular patron, buying drinks from Savich, and during 1927 and 1928 Desbro sold beer in 10-case lots once a week to the place, receiving payment from both Lieb and Savich; Anthony McGill bought whisky there in July, 1928; and Collins, Morgan, and Piland in February and March, 1928; and Agent McGill bought a pint of whisky there in July, 1929. Lieb and Savich were sentenced to four months' imprisonment.

Appellant M. W. (Mel) Paddock was associated during the years with defendant McPhee (not arrested at time of trial) and one T. J. Markee, in the operation of the Samuels Hotel bar, known also as Samuels Hotel cigar store or pool hall. This bar was continuously during this period engaged in the liquor business, at times gambling was also carried on there, and, when carried on, the payments, which were made both under the fictitious fine system and to the city clerk, were increased. Payment was also made during Rossi's administration of so-called park rental to Keating, who says the business conducted there was the sale of liquor. It was generally reputed to be a liquor joint.

McPhee was extensively engaged in importing liquor from Canada during this period, and wholesaling and retailing such liquor outside as well as at the Samuels bar. He was known to Leighty, Keating, and Rossi as a bootlegger. Appellant Paddock and Markee tended bar, and at times were in charge, and all—Paddock, Markee, and McPhee—made the payments for the operation of the place. During 1928 a partition was built in the place, the doors kept locked, and patrons, including Leighty and Keating furnished keys, or were admitted by McTammany, who had a bootblack stand at the entrance. Appellant Joe Carboneau, who operated the sideboard, at one time handled liquor at this place. During the years 1927, 1928, and 1929 Leighty bought drinks there from Markee, McPhee, and Paddock. Hellehan bought beer there in the summer of 1929, at which time there were three bartenders. Helen Scott, an inmate of defendant Marie Lindsay's place in 1929, bought liquor of McPhee. McTammany, the bootblack at the entrance, and doorkeeper during 1928 and until the bar closed in 1929, saw Paddock serve liquor, and got liquor there himself. Renrup bought liquor of McPhee in the place. Collins, Morgan, and Piland bought drinks over the bar on more than one occasion in February and March, 1928. Paddock was sentenced to four months' imprisonment.

Appellant Mouge Tapper was associated with defendant Steve Brakus in the Little Star bar at 213½ Sixth street. The former paid light and water for this place from Sep-

tember, 1927, to July, 1929. It had the general reputation of a liquor dispensary, and government investigators bought drinks of moonshine whisky there in 1928. Payments were made by Brakus and Tapper under the police court system and to Leighty. Tapper and Brakus were sentenced to four months' imprisonment.

Appellant Joe Carboneau was connected with the Samuels Hotel bar, which was a payer in 1927, 1928, and 1929, and also operated the Sideboard bar, where it was admitted he sold liquor, and in which liquor was purchased by Cooper in April, 1929, and again in June. In this place Cooper bought from Carboneau on the evening of June 14, 1929. The next morning his identity as a government investigator became known to Sheriff Weniger, and when, some 15 minutes afterwards, he attempted to buy of Carboneau, Carboneau ordered him (Cooper) to stay out. In June, 1927, five gallons of bonded Canadian whisky, several bottles of whisky, and whisky glasses were seized from Carboneau. He was sentenced to four months' imprisonment.

Appellant Jack Jones, with one Langness, was located in Sweet's Hotel, continuously operating, and a payer under both administrations; in the police docket fictitious names were used; and on one occasion the hotel was charged as a defendant without a charge being inserted. It was also a gambling place, in which Jones acted as bartender; liquor would be brought into the room and served to the players. Jones was sentenced to four months' imprisonment.

Appellant Jack Chisholm operated a bar one block north and one block west of the courthouse, and a little over a block west of the City Hall, in which was the police station. Men were seen drinking at the bar in December, 1927, and whisky was seized and Chisholm arrested by a federal prohibition agent. It was operating in April and June, 1929, when Cooper bought liquor there of Chisholm; it is one of the places from which Cooper was ordered immediately after appellant Weniger discovered his identity. McGill also bought whisky over the bar in July, 1929, and Chisholm was one of those who paid tribute. He received a sentence of four months' imprisonment.

Frank Magnolia, convicted and sentenced, but not appealing, ostensibly ran a fruit store, but was operating pursuant to the established systems, during the period of the conspiracy, a liquor business, for which, during the time collections were made, he paid.

In February, 1929, when the place was raided, drinks were served the officers, who thereupon seized a thousand bottles of beer, 25 gallons of wine, and moonshine whisky.

During both the Herrick and Rossi administrations in 1927, 1928, and 1929, places and persons other than defendants were allowed to operate, such as the Columbia, Violet Lee, Mrs. Warren, Nick Cola, Burke Hotel, Rena Summers, Grace Beatty at the Arment Rooms, owned by Rossi, Keating, and another, Lee's Place, U & I Rooms, Helen Scott at 210 Sixth street, and New Western Hotel, and made payments. Legitimate places were not collected from. But, as they did not concern persons named as defendants, details of their payments and operations were not gone into.

Jeanette Martin, Joe Swan, and Vivian Dugan, defendants who were convicted, but are not appealing, were allowed to operate the Cozy Kitchen at 517 Kelly's alley during 1927, 1928, and 1929. It was a house of prostitution and liquor dispensary, and during the course of the conspiracy made payments when they were being taken during the Herrick and Rossi administrations. Whisky was kept there, and sold, even after the time Rossi is claimed to have confined "park rentals" to "girls"; Williams and McGill having bought in July, 1929. Jeanette Martin was convicted of liquor violation.

Kelly's paint shop, 212 Sixth street, was a house of prostitution and liquor dispensary, allowed to operate during both administrations. Appellant Marie Lindsay was the proprietress and the one who made the payments under the different systems of police court fines, payments to the city clerk, and fictitious park rentals. Keating knew her and the kind of place she ran, and collected from her during the Rossi administration until cessation in October or November, 1929, and during July of that year Williams and McGill purchased liquor there; liquor was there in January, 1929, when Helen Scott (who subsequently that year operated another place and paid park rental, getting her liquor from McPhee) was an inmate. Renrup bought liquor there in 1928. Marie Lindsay was a convicted liquor law violator, and in this case received a sentence of two months' imprisonment.

The St. Francis Hotel was another notorious house of prostitution and liquor joint, allowed to operate as such during Herrick's and Rossi's administrations, and from the proprietress of which, defendant Nell Reed, payments were required while the systems of

collection were in vogue during the alleged conspiracy. She is not appealing from her sentence to two months' imprisonment. Her house was known to Leighty and Keating. Williams and McGill purchased liquor there of her in July, 1929, while Rossi purported to be collecting only from prostitutes. In 1929 she tried to arrange with Cooper, an undercover agent of the government, to handle whisky and to send people to her place for liquor and prostitution. Immediately after Sheriff Weniger discovered Cooper's identity, she refused him liquor. She was convicted of violation of the liquor law.

Harry Brown and Cecil Murphey, appellants, operated Murphey and Brown's. During 1929 Murphey's interests were taken over by Cramer, not a defendant. Murphey and Brown, and Brown and Cramer, successor, operated a gambling place in which itself liquor was not generally sold, but, as the other gambling places handled liquor, business was falling off, and as an attraction they procured defendant Ed Calkin to handle liquor in an adjoining room, from which a door opened into the card rooms. Card players from Murphey and Brown (or Brown and Cramer) would pass into Calkins bar, which was known as the Delicatessen, for drinks, and Murphey, or his employees, would procure liquor in Calkins, take it into the gambling room, and it would be consumed at the tables. This continued throughout the period of the conspiracy, during 1927, 1928, and 1929, both places being allowed by both administrations so to operate, and both paying during the Herrick administration, and Brown and Cramer in the Rossi administration. Appellant Murphey stated the arrangement to Investigator Sloan, and Hans McKinney, an employee of Murphey and Brown's in 1928, and Guy Hellehan, also an employee in 1927, and bartender for Calkins in 1927, testified also to the arrangements and manner of handling liquor. Bailey, chief of police, Keating, city treasurer, and Leighty, clerk and police judge, were familiar with the places, and Conn, traffic officer, was directed at one time, when Bailey was on vacation, by Mayor Herrick to tell Calkins, among others, to see Leighty.

Leighty bought liquor at Calkins' bar during the three years; Hellehan sold liquor over the bar in 1927; English drank in Calkins' place during 1927, 1928, and 1929; Piland bought liquor in 1928. Brown, Calkins, and Murphey were each sentenced to four months' imprisonment.

Appellant Paul Miller was associated with defendants Emil Louviers and Joseph F. Whalen (convicted but not appealing) and one Langness, not a defendant, in the operation of the Club cigar store at 605 and 605½ Cedar street, a block north and half a block west of the City Hall. It was a cigar store, gambling place, and saloon, doing a large liquor business, patronized by Leighty, the business known to Keating, frequented by deputy sheriffs, permitted to run by both Herrick and Rossi, during the three years of the conspiracy, and, whenever collections were being made, paying under all systems. Leighty bought whisky from Louviers during 1927 and 1928. Desbro delivered beer at wholesale to the place in 1929. English bought liquor over the bar from Louviers during 1929. Anthony McGill was in the place during 1929, saw liquor brought into the place, and was, after he had given a statement to federal investigators, suspected by Sheriff Weniger of being a government stool pigeon and by him ordered to stay out of liquor joints. Piland bought of appellant Miller there in 1928. Cooper saw drinking there in April, 1929. Government Agent Johnson raided the place in May and October, 1929, and seized whisky, beer, and gin. Defferding bought over the bar from appellant Miller two or two and one-half years before the trial. Miller was sentenced to four months' imprisonment and Louviers to four months concurrent with the sentence he was then serving, and Whalen to thirty days' imprisonment.

Every place and person concerning which or whom testimony in detail was offered and admitted made payments either under one administration or the other, or both, and every such place and person was connected with, or engaged in, the traffic in liquor. The same officials under Rossi and the same violators continued their same roles, merely changing the record from traffic violations to park rentals.

This concludes the statement of facts derived from the brief of the appellee, and which is sustained by substantial evidence.

The attitude of the trial court in regard to the situation disclosed by the evidence is found in the statement made in ruling upon the motion of the defendant and appellant Rossi for a directed verdict of acquittal:

"I will tell you gentlemen the way I view this thing, and I am not passing upon the weight of this evidence. The evidence shows that at the municipal election prior to May, 1929, Mr. Rossi was conversant with conditions at Wallace, and I would infer from the

evidence that it was an issue whether the conditions existing should continue or not. He undoubtedly was familiar with all conditions at Wallace at that time, as it was made an issue in the campaign. Those conditions were the unlawful sale of intoxicating liquors, gambling and prostitution. So there is evidence from which a jury can draw that he was inaugurated in office with full knowledge of all of these evils. So there is evidence tending to show that those conditions continued to exist by the same parties until May, 1929, and that after May, 1929, these same parties that he knew had been violating the National Prohibition Law again paid tribute to the treasurer of the city in order to obtain protection. They were by the same parties. While they may ostensibly have had a different purpose, yet the evidence shows that the evil continued to exist and did not cease until probably the indictment was returned. I think the evidence—I do not say proves, but there is evidence tending to show that during all of his acts and conduct as mayor of that city he did it with the full knowledge of the existence of all of these facts, a matter that could have been stopped by him, but in place of being stopped by him he licensed people to operate that he must have known were violating the prohibition law along with the violation of the gambling law. The very fact that he licensed these people to gamble was putting them in a position and allowing them to maintain a position whereby they could violate the prohibition law. In other words, they could violate the prohibition law. In other words, they were permitted to continue a business that enabled them to violate the prohibition law with his knowledge. Now, I think there is evidence bearing on that point, and I am not deciding this case, gentlemen; I am just determining whether or not there is sufficient evidence in my judgment to go to the jury, and I am going to let this case go to the jury."

It is further shown by the ruling of the trial judge upon the motion of defendant and appellant Weniger, after argument thereon:

"I am not going to decide this now. If I let this go to the jury it will be solely upon the strength of McGill's testimony. The fact that an officer, as a state officer, had knowledge of a violation of the Federal statute would not of itself be sufficient to make him a party to a conspiracy. I believe the testimony should go further and show that he had done some act in furtherance of the conspiracy, or that he had actively participated in it, or cooperated in it. It is true that all officers, whether state or Government, have

an obligation to perform with reference to the enforcement of the law, whether it is a law that comes within the jurisdiction under which they work, or are employed, or not. A state officer has a certain obligation to assist a Federal officer in the performance of his duty. An officer of the national government has a corresponding obligation toward a violation of the state law. I feel that is true. But I think, on the other hand, that mere acquiescence or mere knowledge on the part of this state officer that the National Prohibition Law is violated would not of itself be sufficient to make him a party to the conspiracy, but it would have to go further and show some cooperation upon his part for the purpose of the conspiracy. Now that is what I think about the law.

"Now the question comes as to the application of the facts. When we come to the fact that these two deputies here were in a saloon drinking out of glasses, drinking something—it may have been the color of liquor, as counsel says—would not be sufficient to entitle the case to go to the jury on possession or sale. In other words, you couldn't convict them of the unlawful sale of liquor, because there was no evidence of sale—no evidence that the glasses contained more than one-half of one per cent of alcohol. It would be a matter of speculation and guess on the part of the jury.

"Then the question with reference to the two detectives, or two agents. It appears that prior to the time that they were invited to the sheriff's office that the sheriff had a number of forgeries—two instances—and that he was endeavoring to ascertain the people that were guilty. It appears that these two agents were in town, driving one kind of a car and carrying a license of another car, which would be a suspicious circumstance, and would naturally lead the sheriff, in the performance of his duty, to look upon their presence with suspicion, and there is nothing unusual in having these men come to his office and inquire of their business in the town, and why they were there. That was merely consistent with his line of duty, and it would be just such a thing as the sheriff would be expected to do in the proper performance of his duty. That matter has little weight with me.

"Then we come to the matter that soon after they left the office of the sheriff that their identity was disclosed to these operators of the joints. That of itself would not be sufficient, in my judgment, to connect him with the conspiracy, or to make him a party. I take it that the information was known to

seven or eight others at least. There is nothing here tending to show that the sheriff gave out the information, or any of his deputies— there is nothing to show that they ever called on the telephone or had any communication with any of these places whatsoever, and in a little community the size of Wallace when a fact of such importance as that is well known to seven or eight people, it is not at all unusual for it to become a matter of general knowledge within a very short time.

"If that was all—I want to say I am in doubt about this—if that was all I would never think there was sufficient evidence to entitle this matter to go to the jury. The thing that strikes me strongest in this case is the testimony of McGill, and for the purpose of this motion we must consider that evidence as true. He stated that the two deputies told him I believe that the sheriff said something about his making beer for the coming Elks' Lodge convention. Now if the sheriff had any previous knowledge that that man was violating the law in making beer, it would be nothing unusual for him to call him to his office, but the fact that there is nothing in the evidence tending to show that he had any prior information of that kind, and there is evidence to the effect that after making these inquiries, and after he had suspicioned that McGill was a Government man, or a stool pigeon, that he warned him to keep away from these joints. Now that warning to keep away, if true and for the purpose of protecting these people, would be active participation. A man can actively participate in a thing by going there and aiding in the sale of liquor, or by going there, or by preventing other people from going there who would tell or disclose the true situation. There is the idea. He stated that the sheriff told him to keep away from the joints. If the sheriff suspicioned then that he was stooling, or was connected with the enforcement of the law, and ordered him to keep away from these joints that had been, according to the evidence, violating the National Prohibition Law—that would be the slender thread upon which it will go to the jury, if it goes.

"I can reconcile all the rest of the testimony here. I can see the testimony shows inaction upon his part—I say the testimony shows that—but I do not regard that as sufficient. There must be some active participation, in addition to knowledge and inaction. I think that fully states my position in the matter at this time."

The instructions of the trial court, which are quoted in part, contain an admirable statement of the law as applicable to the evidence, and, as the instructions were not excepted to and are not complained of on appeal, we quote therefrom as the statement of the law applicable to the problem presented to this court the following portions of the charge:

"Under the United States statutes it is constituted a crime against the United States if two or more persons conspire to commit any offense against the United States, and one or more of such parties do any act to effect the object of the conspiracy. There are, therefore, two elements which go to make up the crime. The first is the act of conspiracy to commit an offense against the United States, and the second is the doing of some act by one or more of the parties to effect the object of the conspiracy. Conspiracy is a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means. Mere knowledge or acquiescence of the existence of a conspiracy is not sufficient to constitute one a party to a conspiracy. There must be an intentional participation in the transaction. However, the combination may be by express understanding or agreement between the parties, but it need not be so arrived at. It may be arrived at by tacit and common assent, without specific mutual arrangement, as when parties work and act together under a manifestly common design or intent to effectuate a common unlawful purpose. Thus, if two or more persons, by their acts and deportment, pursue a common project or design, by the same adaptable means, one performing one part of the common plot and another or others another part or parts thereof, so as to complete it, all with the view of attaining the object which they are pursuing, this will be sufficient to constitute a conspiracy. There need not be even previous acquaintance, nor is it essential that each conspirator should know the exact part or parts to be performed by the other or others in execution of the conspiracy. In other words, it is sufficient if two or more persons, corruptly and with knowledge of what they are doing, by their acts and conduct cooperate and work together and in unison in pursuance of a common design or purpose, for the obvious effectuation or consummation of a common object, if that object be criminal in character or unlawful, and this whether or not there was at any time an assembling of the parties or specific understanding between or among them. Of course, under the

statute, two [one] or more of the parties must have done some act to effect the object in view by them, in order to complete the offense of statutory conspiracy.

"Again, one who, after a conspiracy is formed, with knowledge of its existence and the purpose thereof, joins therein and aids and participates in its execution, becomes as much a member thereof from that time as if he had been an original conspirator; but you must understand that one cannot be made a member of the conspiracy except by his own conscious acts and by his knowledge of the formation of such a conspiracy and his willingness and intention to participate therein. If, therefore, you should find that a conspiracy had originally been formed and that certain of the defendants subsequently had done things which were the object of such conspiracy, yet they would not be guilty of this charge unless in addition thereto you find that they consciously, knowingly and corruptly entered into the conspiracy that had originally been formed and that their acts were the result of a joint and corrupt concert of action.

"It is a characteristic of the crime of conspiracy that the acts and admissions of any one of the conspirators, while engaged in the effectuation of the object of the conspiracy, are deemed to be the acts and admissions of all, and all alike binding as to all. Not so if the acts or admissions are done or made previous to entering into the conspiracy or after the same has been dissolved, or the parties thereto have ceased their cooperation. In such case the acts and admissions are binding only upon the one acting or speaking. The offense charged in the indictment must be accomplished knowingly and with a corrupt purpose and motive to do some unlawful act or acts as alleged in the indictment; that is, to commit an offense or offenses against the Government in transgressing the National Prohibition Law. It is not essential that the defendants should actually commit the offense or offenses against the United States that the indictment charges, but it is sufficient that they have entered into a conspiracy with the object of committing the crimes or offenses against the United States as charged in the indictment, and any one or more of them does some act in furtherance of the conspiracy, with the object or desire of carrying it into effect.

"The indictment charges these defendants with seventeen overt acts, and you must find from the evidence beyond a reasonable doubt that one or more of those engaged in the conspiracy or combination committed some of these overt acts with the object and design of carrying out the purpose of the conspiracy in the violation of the National Prohibition Law, and must have been done as set forth in the indictment. * * *

"It is not necessary that the sole object and purpose of the conspiracy charged in the indictment was to violate the National Prohibition Act of the United States. It is sufficient if one of the objects of the conspiracy was to violate such law. A conspiracy to permit gambling or prostitution would not be a conspiracy to violate the laws of the United States. There is some testimony introduced tending to show that gambling and prostitution were permitted in Wallace. This testimony was admitted because it was interwoven with the evidence relating to the charge of violating the National Prohibition Law, and you may take such testimony into consideration in connection with all other facts and circumstances disclosed by the evidence in this case, as shedding light on the question as to whether there was a conspiracy to violate the prohibition laws as alleged in the indictment.

"It is not necessary that persons charged with conspiracy should profit as a result of the commission of such a crime. It is sufficient if the evidence satisfies you beyond a reasonable doubt of the existence of the conspiracy and of the doing by one or more of the conspirators of an overt act or acts in furtherance of the conspiracy.

"The mere fact that one may be an employee of a conspirator is no defense if, in fact, the evidence shows beyond a reasonable doubt that such employee knowingly, wilfully and corruptly aided in carrying out the purposes of the conspiracy. The crime of conspiracy is an entirely separate and distinct offense from that of violating the provisions of the National Prohibition Law, and the fact that some of the defendants in this case may have heretofore been convicted of violating the National Prohibition Law does not constitute a defense to the charge of conspiracy set forth in the indictment.

"It is admitted in this case that the defendant, Weniger, was sheriff of Shoshone County during the time the conspiracy is alleged to have been in existence, and that W. J. Bailey was a police officer of the city of Wallace, Shoshone County, during said time. The failure of the defendants to take action to prevent the commission of the offenses, if any, occurring at Wallace, would not make them parties to a conspiracy to violate the National Prohibition Law, unless they pur-

posely refrained from taking action against the persons, if any, who actually engaged in the conspiracy to violate the law, as alleged in the indictment, with full knowledge of the conspiracy and with the view and object on their part of protecting and aiding it to such an extent as would warrant a reasonable inference of their participation therein. In other words, mere inaction upon the part of these defendants would not be sufficient to warrant a conviction unless they purposely refrain from acting with the view of protecting the persons, if any, who were actually engaged in violating the law as set forth in the indictment, or unless the evidence shows beyond a reasonable doubt that they knowingly and corruptly participated in the conspiracy and assisted in carrying out its common design and purpose.

"If you find from the evidence beyond a reasonable doubt that a conspiracy existed between two or more of these defendants and that such conspiracy continued after May 13, 1929, or after the time the defendant Herman J. Rossi became Mayor of Wallace, said defendant would not be guilty unless you should find beyond a reasonable doubt that said defendant knew of the existence and objects of such conspiracy, and therefore wilfully, knowingly and corruptly entered into the same to effect its object and purpose, as one coming into a conspiracy at any stage of the proceedings with knowledge of its existence and purpose is regarded in law as a party to the conspiracy and as a party to all of the acts done by any of the other parties to the conspiracy, either before or afterwards, in pursuance of the common design and purpose.

"An accomplice is one who aids, abets or is connected with another in the commission of crime. If the allegations of the indictment are true, the witnesses L. L. Leighty, C. A. Keating, Claude Ralls, Helen Scott and Ruth Klein should be regarded as accomplices. * * *

"In determining the question of the formation or existence of a conspiracy, the acts and declarations of the persons accused may be taken into consideration.

"Evidence of the declarations of those defendants who have been acquitted by an order of this court should not be considered by you.

"Guilt must be the result of a person's own conscious acts wilfully and corruptly done in violation of law. The guilt of a defendant must be shown by his acts, conduct and declaration, and independently of the statements of others. In other words, a person cannot be convicted of a crime by the declarations of other parties.

"Conspiracy may be established by direct evidence or by circumstantial evidence. But circumstantial evidence to warrant a conviction in a criminal case must be of such character as to exclude every reasonable hypothesis but that of guilt of the offense imputed to the defendants, or, in other words, the facts proved must all be consistent with and point to his guilt only, and inconsistent with innocence. The hypothesis of guilt should flow naturally from the facts proven and be consistent with them all. If the evidence can be reconciled either with the theory of innocence or with guilt the law requires that the defendants be given the benefit of the doubt and that the theory of innocence be adopted."

In view of the fact that appellants all assign as error the failure of the court to instruct the jury to acquit for lack of sufficient evidence, and the argument before this court upon that question, in which it is claimed that the evidence is insufficient to establish the guilt of certain defendants or any or all of them beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence, it should be stated at the outset that the question before the appellate court upon an appeal in which it is claimed that the evidence is insufficient to justify a conviction is not the same question that is submitted to the jury. The question for the appellate court is whether or not there is substantial evidence upon which the jury could base its verdict, and it is for that reason that we have accepted the statement of the evidence prepared by the appellee as the basis for our consideration. The relative duty of the jury and the appellate court is stated by the Circuit Court of Appeals of the Seventh Circuit in a case very similar to that at bar, opinion by Circuit Judge Evan A. Evans, Allen v. U. S., 4 F.(2d) 688, 690, as follows: "Before discussing the evidence, it may be well to point out that the rule laid down in Applebaum v. U. S. (C. C. A.) 274 F. 43, and frequently followed by this court (Holy v. U. S., 278 F. 521; Grossman v. U. S., 282 F. 790, 793; Wolf v. U. S., 283 F. 885, 888; Talbot v. U. S., 286 F. 21; Inks v. U. S., 290 F. 203), must govern us in determining whether there is present a jury question. It is of no avail for counsel to cite cases which have attempted to draw a distinction between 'evidence' and 'substantial evidence,' or to point to an occasional decision where the appellate court weighed the evidence and re-

viewed the decision of the jury, upon a disputed issue of fact, for such is not the rule in this jurisdiction. The right of an accused to a trial by jury upon all issues of fact is guaranteed by the Fifth Amendment to the Constitution. But the accused cannot have both a trial by a jury, and a retrial by an appellate court. If the evidence be conflicting, then the issue is one for the jury, and no asserted distinction between 'evidence' and 'substantial evidence' can afford a basis for a modification of this rule."

One of the principal contentions of the appellants is that, if the evidence shows any conspiracy whatever to violate the National Prohibition Act, it does not show a conspiracy alleged in the complaint; that is, one continuing conspiracy in which all the appellants were involved, but it shows two separate and distinct conspiracies, one, that originating, or rather continuing, during the administration of Mayor Herrick, and the other, a new and different conspiracy originating under the administration of his successor, appellant Rossi.

There are two views of the evidence, that advanced by the government and shown in the foregoing statement, namely, that there is a continuing conspiracy, and that most of the conspirators were continually operating thereunder, and that the new mayor merely took the place in the conspiracy vacated by his predecessor, that the slight change in the method of operating the conspiracy manifested by the evidence is of no particular consequence. The other view advanced by the defendants is that there were two conspiracies, because during the Herrick administration money was covered into the city treasury by the subterfuge of filing fictitious complaints against fictitious defendants and the ostensible imposition of fines which were subsequently paid into the treasury, and under the new system under the Rossi regime the money was paid directly to the city treasury and receipts issued, ostensibly for the rental of space in the public park. However, the conspiracy charged in the indictment had nothing to do with the disposition of the moneys obtained by the city officials. So far as the conspiracy to violate the National Prohibition Act is concerned, it is wholly inconsequential whether they pocketed the money or gave it to the city. It is true that in this case the purpose of the city officers involved in the alleged conspiracy was to augment the city income. It is not contended that they personally profited by the amounts paid in connection with the operation of illegal business, while in

most of the cases brought to our attention involving similar conspiracy by local law enforcement officers the money exacted from the conductors of illegal business was received and applied for the personal profit of the peace officers and other municipal officers involved in the conspiracy.

The theory of the appellants may best be stated in the terms of an instruction proposed by them to the court for the charge to the jury, the refusal of which was excepted to and assigned as error, and is specified as such to be reviewed on this appeal. Appellants' proposed instruction No. 29 is as follows: "Even though the jury may believe from the evidence beyond a reasonable doubt that there was one or more conspiracies, as that term is defined in these instructions, existing between two or more of the defendants herein to violate the National Prohibition Act, still, if you believe that it was not a central and continuing conspiracy, as charged in the indictment, but there was one conspiracy having its inception and beginning in the term of office of which the defendant W. H. Herrick was mayor of the city of Wallace, and that the said conspiracy ended and closed with the cessation of the fine and collecting system in May or June, 1928, and that thereafter a new and a different conspiracy was inaugurated and started in May, 1929, during the official administration and term of office of Herman J. Rossi, as mayor, and that the said last-named conspiracy was not connected with and was unrelated to the conspiracy, if any there was, existing during the administration of the defendant Herrick—then, if you so find, you should acquit all of the defendants, and this for the reason that the Government's case is based and predicated upon the assertion that the whole transaction or series of transactions and happenings set forth in the indictment constituted but a single conspiracy and was such from beginning to end."

The court declined this instruction, but did in the above-quoted instruction inform the jury that, if they found that a conspiracy existed between two or more of the defendants, and that such a conspiracy continued after May 13, 1929, or after appellant Rossi became mayor, defendant Rossi would not be guilty, unless he knew of the conspiracy and entered into the same. This instruction, so far as it applies to Mayor Rossi, while not the exact equivalent of that requested, gave him the benefit of the contention on his part that he could only be found guilty by showing that he joined in an existing conspiracy which could not be proved by showing that he origi-

nated and became a party to a new conspiracy. There is, however, another aspect of the instruction which not only affects defendant Rossi, but all the defendants, and that arises from the contention by the appellants that the conspiracies, such as they were under the Herrick administration and under the Rossi administration, were separate and ·distinct conspiracies, not merely because a new mayor had been installed, but because of the fact that the officers engaged in the first conspiracy, if any, had entirely ceased and abandoned their collection of money from illegal business, and that such abandonment continues over a period of at least a year, and that, when the new mayor, after his election, took up with the officers of the city, whether they were the same or partly the same officers who had theretofore participated in the conspiracy during the Herrick administration, they evolved a new system and agreement for the collection of money from such illegal business. If it is possible for the jury under the evidence to have determined the facts in accordance with the contention of the appellants, it was the duty of the trial judge to give the instruction. There was substantial evidence to justify the conclusion of the jury that there was a single continuing conspiracy during the period mentioned in the indictment, and that the newly elected officers, defendants, and appellants herein joined an existing conspiracy. Nevertheless the defendants were entitled to an instruction to the jury upon the view of the evidence they maintained and to argue to the jury their contentions upon the facts. We have examined the evidence to ascertain whether or not there was sufficient justification for the contention of the appellants in the evidence adduced before the jury to justify and require the instruction proposed by them based upon the theory of two separate conspiracies with an interim between the two. It is a fact that for nearly a year the system of collecting moneys from liquor dealers and others engaged in gambling and prostitution was abandoned.

Under these circumstances, there is no doubt of the right· of the defendants to a proper instruction applicable to this situation. The difficulty with the proposed instruction is that the jury were to be thereby instructed that, if they found there were two conspiracies instead of one, they should acquit all of the defendants who entered into and participated in the second conspiracy, and did not participate in the conspiracy. alleged in the indictment; that is to say, if under the facts the original conspiracy charged

in the indictment terminated in May or June, 1928, and a new and different conspiracy was inaugurated and started in May, 1929, the defendants who participated in the illegal conspiracy before the date of its abandonment . would nevertheless be guilty of the offense charged in the indictment. Rossi is the only defendant who claims that he was involved in a second conspiracy and was not involved in the first, if there were two conspiracies as appellants claim. As pointed out above, the instructions were as favorable to him as he was entitled to, in the absence of a specific request on his own behalf for an instruction directing an acquittal of such defendants as engaged in the second conspiracy and did not engage in the first, if any there were. Appellant Rossi offered no separate instruction upon this subject, but joined with the other defendants in instruction No. 29, and another similar instruction No. 19, to the effect that all of the defendants should be acquitted in the event that the jury found two separate and distinct conspiracies. These instructions were properly refused for reasons stated.

One of the inherent difficulties in the case at bar is the question as to whether or not there was one conspiracy or a large number of conspiracies. At first blush there appeared to be no community of interest in the different individuals who were conducting the various forms of illegal business. They are in a sense competitors rather than partners in crime. It might well be argued that the central conspiracy involved· in the case was that upon the part of the municipal authorities to exact tribute from the violators of the law, and that the proprietor of each individual place of business where such violations were to be perpetrated, by yielding to the demands of the municipal authorities for regular monthly contributions to them, became a party to a conspiracy to violate the law at his particular place of business. It might well be argued then that there were as many conspiracies as there were places of business in each of which there was a common agreement on the part of the municipal authorities and the operator of the place that in that place, for a monthly consideration paid therefor, violations of the law would not be interfered with. Aside from the question of procedure, this view would not be advantageous to the defendants, for it would justify the conviction of the proprietor of each particular place as a member of the conspiracy with reference to that place, and would result in the conclusion that the municipal authorities who exacted tribute were guilty of as many

conspiracies as there were places. The defendants made no contention in the trial court based upon any theory of more than two conspiracies. The theory of more than two conspiracies is not very definitely advanced on appeal. The attorney for all the appellants, other than Rossi and Weniger, after quoting from the opinion of the court delivered by Judge Woolley in Wyatt v. U. S. (C. C. A.) 23 F.(2d) 791, 792, states: "And the witness Leighty says specifically, that 'so far as I could see every man was acting independently.'" The quotation referred to from Wyatt v. U. S. is as follows: "Having a responsibility for the enforcement in this circuit, not only of the National Prohibition Law, but of federal laws generally, we are strongly of opinion that the conspiracy statute should not be stretched to cover and be misused to convict for offenses not within its terms, and that, when resorted to, the conspiracy alleged must be proved as charged. When, as here, one large conspiracy is specifically charged proof of different and disconnected smaller ones will not sustain conviction; nor will proof of crime committed by one or more of the defendants, wholly apart from and without relation to others conspiring to do the thing forbidden, sustain conviction. Terry v. U. S. (C. C. A.) 7 F.(2d) 28, 30; United States v. McConnell (D. C.) 285 F. 164, 166."

A further quotation from the decision in that case, however, will show that it was the view of the court that the combination of retailers of alcoholic liquor with the city authorities for the extortion of money from such violators for protection was a single conspiracy for a common purpose, namely, that of making the town a safe place for the violation of the National Prohibition Act. It is as follows: "While each person in the offending combination here disclosed was, doubtless, actuated by motives of self-interest, whether in extorting money or paying money for protection against raid and arrest, it is evident that the relations of the parties one to another—not only those who dominated the organization, but also those in lower spheres—were of a character and their actions were so linked as to indicate a common purpose to put their boroughs outside the National Prohibition Act and make them a safe place for the manufacture and sale of 'moonshine' whisky. Astounding as this may seem, it was, nevertheless, possible, and, if the evidence is believed, it was true. Accordingly we find the evidence sustains the verdict convicting all defendants save those we shall specifically except."

The subject of a similar conspiracy to systematically violate the National Prohibition Act in the city of Pittsburgh, Pa., was before the same court in United States v. Wills, 36 F.(2d) 855, 856, and Meyers v. U. S., 36 F.(2d) 859. In both cases the opinions were delivered by Judge Woolley. In U. S. v. Wills the question as to whether there was one central conspiracy or number of lesser conspiracies was essential to decision of the case, for upon the charge of general conspiracy the trial judge directed an acquittal upon the ground that the evidence showed "a number of conspiracies between different groups, and without any connecting link between different groups." In that case the appellants were contending that the first acquittal prevented their further prosecution for the smaller conspiracies. It was in that connection that the court pointed out that the failure to prove the conspiracy alleged in the first place was due to the inability to connect up sundry smaller conspiracies in the one conspiracy charged in the indictment. It was evidently the view of the Third Circuit Court of Appeals, as shown in U. S. v. Wills, supra; Meyers v. U. S., supra, and Wyatt v. U. S., supra, that a general conspiracy to make a small borough or community a safe place for the violation of the National Prohibition Law was such a common bond of interest between the authorities granting protection and the owners of the various places of business where the law was to be violated as linked them together in the common conspiracy to violate the National Prohibition Law. The Circuit Court of Appeals of the Seventh Circuit is evidently of the same opinion. Allen v. U. S., supra. That is to say, while each proprietor was interested in the conduct of his own illegal business, and in a sense was not interested in that of his competitor, it was vital to both that the enforcement officers of the municipality, state, and nation should not interfere with such business, for such interference would have been disastrous to both.' I am inclined to agree with this view of the situation, but it is sufficient for the purposes of this appeal to say that, although mentioned or suggested in the briefs on appeal, the question of whether the evidence justified the jury in finding there were more than two conspiracies was not presented in the court below and is not before us for review, except as involved in the contention of some of the appellants that the evi-

dence against them was insufficient to justify the verdict, a question which will be presently considered.

It is argued that there was no proof of conspiracy to violate the National Prohibition Law, because revenue for municipal purposes was to be derived from the keepers of gambling places, houses of prostitution, and the operators of slot machines. It is conceded that gambling was prohibited by the laws of Idaho (Idaho Comp. St. §§ 6425, 8315, 8314, 8310, 8308, 8307); also by Ordinance 114 of the city of Wallace. But it is suggested, rather than argued, that the municipal authorities had the right to regulate houses of prostitution, and for that purpose to impose a license fee upon the keepers of such houses, and that they were so advised. It is perhaps sufficient to dispose of this contention to say that no such license fee was imposed by the city authorities, and that the exactions from such proprietors was made through the subterfuge of arrest for traffic violations which had not occurred as above stated. It should be added, however, to this statement that, although section 3974 of the Political Code of Idaho (Comp. St. 1919) purports to authorize the suppression or regulation of houses of prostitution by municipal authorities, the state law also makes every inmate of such house a vagrant (Idaho Comp. St. § 8587), and by the laws of Idaho such inmates and the male patrons were each guilty of a separate crime for each separate act of fornication (Idaho Session Laws 1921, c. 209) or adultery (Idaho Comp. St. § 8284). Idaho also has a law prohibiting traffic in intoxicating liquor (Idaho Comp. St. tit. 22, c. 125, § 2604 et seq.). By the laws of Idaho the place where gambling is conducted is a moral nuisance (Idaho Comp. St. § 6425) and the place where liquor is sold is a common nuisance (Idaho Comp. St. §§ 2631, 2635). Appellants make much of the contention that there was no proof of the specific agreement to violate the National Prohibition Law (27 USCA) as distinguished from the state laws which were openly violated, but it was unnecessary to show such an agreement by direct proof. The circumstances that nearly all of these places sold liquor openly and without any interference from the city officials whose duty it was to stop them, and that money was paid to the peace officers of the community by such proprietors with the obvious understanding that there would be no such interference, indicates an agreement that such business should be carried on without molestation, and that the city officials

should receive part of the proceeds of such violation of the National Prohibition Law. As was said in the opinion of the Circuit Court of Appeals of the Seventh Circuit by Judge Evans in Allen v. U. S., 4 F.(2d) 688, 691:

"Defendants substituted for prohibition what was in effect a license system, the license fee being paid by some conspirators and divided by others, and it was in large measure based upon what the traffic would bear. Nor was the evidence showing the maintenance of houses of ill fame, as distinguished from soft drink parlors, for which protection money was paid, immaterial. The evidence shows that, by whatever name these places might go, they were conducted in part for the profit incident to the sale of intoxicating liquor.

"The fact that other crimes and offenses may also have been within the contemplation of the operators cannot relieve the defendants of the offense here charged. For the objects of a conspiracy may be numerous. Some may even be innocent, but, if one of such objects be to commit an offense against the United States, the case falls within the condemnation of the statute. Taylor v. United States (C. C. A.) 2 F.(2d) 444. Where individuals agree or have a common understanding to grant to those selling intoxicating liquor immunity from prison sentence, the case is brought within the statute, for such immunity has for its real object the maintaining of common nuisances as defined by the Volstead Law, as well as the manufacturing, transportation, and sale of intoxicating liquors."

Having disposed of the general contentions common to all the defendants, I will now consider the points raised in behalf of the various appellants. Defendant Weniger, the sheriff of the county, stands in much the same relation to this conspiracy as he did to a similar conspiracy in the town of Mullan, in Shoshone county. Indeed, he contends that his conviction of a conspiracy in the town of Mullan requires his acquittal in this case, for the reason that the particular act proved against him, namely, that of interference with federal prohibition officers, was the identical act proved in the conspiracy case involving officials in the town of Mullan. It is unnecessary to consider this contention other than to say that there is no merit in it. The conviction of Sheriff Weniger in the Mullan case was declared by this court not to be sustained by the evidence, and the judgment was reversed. Weniger v. U. S. (C. C.

A.) 47 F.(2d) 692. Upon the authority of that decision, the conviction of the appellant Weniger must be reversed in this case. There is one important distinction between the two cases, in this, that defendant Weniger had his office in Wallace, the county seat of the county, and it is reasonable to assume, in view of the verdict of the jury, that he knew that the National Prohibition Law was being openly violated in the town of Wallace. His statements hereinabove quoted in a conference with the mayor of the city indicated his knowledge of such violations. It is also apparent from his conversation with the national prohibition officers that he resented their presence in the town of Wallace, or within his county, and without warrant of law ordered them to remain out of his county. This act of interference, coupled with complete abstinence from any effort to enforce the laws of the state, which as an officer he was bound to enforce, has been held in the cases we have cited, dealing with similar conspiracies, to be sufficient evidence to justify the conviction, provided it is established that the appellant had knowledge of the conspiracy. The only attempt to show knowledge on the part of the sheriff of the conspiracy and co-operation with the conspirators is the same evidence relied upon by the government and set forth in our opinion in Weniger v. United States, namely, that, shortly after the sheriff acquired knowledge of the fact that national prohibition officers were in Wallace, such officers found it impossible to purchase intoxicating liquor where, according to the evidence, such liquor was freely and usually sold to all comers. From this fact it is sought to draw the inference that the sheriff warned the violators of the law of the presence of the federal officers. As we held in Weniger v. United States, supra, this was not sufficient, and, upon the authority of that case and a similar case in the Third Circuit, McLaughlin v. U. S., 26 F.(2d) 1, the judgment against appellant Weniger must be reversed.

In examining the case of the various appellants, it should be borne in mind that it is not necessary to specifically prove that each of these defendants himself violated the National Prohibition Law. He is not here charged with the violation of that law, but with the conspiracy to violate it, and, if he was a member of the conspiracy, the numerous overt acts of other defendants alleged and proven would be sufficient to justify his conviction. It may be illustrated by the case of Tony Armani, one of the appellants. It is claimed that the only evidence against this defendant is that he paid $25 per month for protection for three months, October, November, and December. During that period he told Leighty that he had some wine that he wanted to dispose of, and that when he had disposed of it he would not handle any. On cross-examination the witness testified: "I don't know whether it is known as bitters or not. He had some kind of bitters there. I don't know whether they were intoxicating or not." Upon the basis of this cross-examination it is contended that bitters were not proved to be alcoholic liquor within the meaning of the National Prohibition Act (27 USCA). I need not consider whether or not the wine that this appellant desired to sell was intoxicating; it is sufficient for the purpose of this case to say that this payment to the city officials for noninterference with the sale of this wine was sufficient under the evidence to justify the conclusion of the jury that he was one of the conspirators in the general scheme to make the city of Wallace a wide-open town in which the National Prohibition Law could be safely violated. In view of the contention that the making of these payments by Tony Armani, coupled with the evidence just quoted, was insufficient to go to a jury on the question of his participation in the general conspiracy, it should be noted that it was conceded in the trial court that all payments made by the defendants were made in pursuance of the scheme to cover up the purpose of such payments by either fictitious proceedings in the police court or by receipts for rental of space in the public park.

It is sufficient to say with reference to the other appellants that their connection with the conspiracy is briefly stated in the quotation from appellee's brief and sustains the verdict of the jury.

With reference to appellant Rossi, I am in accord with the above-quoted views expressed by the trial judge at the close of the evidence above quoted.

Judgment should be affirmed as to all the appellants except appellant Weniger, and reversed as to him.