WILDER v. UNITED STATES.
STEIN v. SAME.
Nos. 1694, 1697.

Circuit Court of Appeals, Tenth Circuit.
Nov. 28, 1938.

178

A. F. Moss, of Tulsa, Okl. (H. R. Young, of Tulsa, Okl., on the brief), for appellant Lew Wilder.

C. A. Warren, of Tulsa, Okl. (Hugh Ownby, of Tulsa, Okl., on the brief), for appellant Harry Stein.

Whit Y. Mauzy, U. S. Atty., and Paul O. Simms, Asst. U. S. Atty., both of Tulsa, Okl.

Before PHILLIPS, BRATTON, and WILLIAMS, Circuit Judges.

BRATTON, Circuit Judge.

The indictment in this case contained two counts. Lew Wilder, Enos Pickett, Ben E. Chandler, Curtis Brumley, Everett S. Collins, Harry Stein, and thirteen others were charged in the first count with entering into a conspiracy among themselves and with fifteen other named persons and with divers others whose names were unknown. The purposes of the conspiracy charged in that count were that they would engage in the business of distilling whiskey and other distilled spirits without registering the stills used, carry on the business of distillers at various places without giving bond and with the intent to defraud the government of tax on the spirits distilled, make mash fit for distillation on premises other than a distillery authorized according to law, remove distilled spirits on which the tax had not been paid to a place other than a distillery warehouse, conceal distilled spirits so removed, and possess distilled spirits in containers not bearing the strip stamps required by law, all in Creek County, Oklahoma, in violation of Sections 1152a, 1152g, 1162, 1184, 1397(a) (as amended), 1185, and 1287 (as amended),

of Title 26, U.S.C.A.; and it was charged that the duration of the conspiracy was from February 1, 1935, to September 1, 1937. Seventeen overt acts were set forth. Wilder was found guilty on the first count and not guilty on the second; Stein was found guilty on both counts but the court granted him a new trial on the second; and John E. Whitwell was found guilty on the second count, but the court granted him a new trial. Wilder and Stein perfected separate appeals. All parties stipulated that both appeals be heard upon a single record, and disposition may conveniently be made of them together.

The sufficiency of the evidence to support the verdict is challenged. The question is deemed to be decisive and eliminates need to discuss others. Accordingly, we proceed immediately to its consideration. Wilder was elected sheriff of Creek County in 1914 and served one term. He was elected again in 1934, was re-elected in 1936, and was holding office when indicted and when tried. Pickett, Chandler, and Brumley were his deputies at the time of the trial; Collins was county attorney; and Stein was the first sheriff of the county after statehood, and was later deputy under Doc Livingston. Emma Foreman was engaged in selling illicit liquor near Bristow, in Creek County, in 1933, 1934, and 1935. Stein came to her place in April or May, 1935, and told her that he had been sent by Wilder to collect for the liquor business, and that she was to pay $100 back money and $25 per month. She replied that she was not making anything and could not pay the $100. He returned in two or three weeks, and she again told him she could not pay $100. He came again a day or two later, at which time she paid him the $25 and told him that the next time she was in Sapulpa she would pay the $100. About a week later she borrowed $100 from the bank, but changed her mind on the way to Sapulpa and decided not to pay it to Stein, and returned it to the bank. Sometime between Stein's first and second trips to her house she went to the office of Wilder in Sapulpa and told him that she was not making any thing and could not pay the $100. He replied that it was her hard luck and that she had better quit. She went to see Stein later in the day and told him that she could not pay the $100, and he said that she would have to pay it. Some time thereafter she talked with Wilder on the telephone. That conversation took place immediately after federal officers raided her place in 1937 and found some whiskey. She told Wilder that an article had appeared in the local paper stating that he made the raid and arrested her. She asked him why he caused the article to be published. He replied that he did not have it done; that he did not know anything about it; and that they had been friends for thirty years—too long to fall out. She then told him that if he failed to have the article retracted she would put one in the paper saying it was not true; and he asked her not to do that because it would just keep things stirred up. She was charged with possession of the liquor seized by the federal officers and she pleaded guilty but had not been sentenced at the time she testified in this case. Stein went to Roy Kennedy's place near Bristow in April, 1935, and told Kennedy that he understood he was making whiskey and that he should get lined up. Stein asked Kennedy how much he would be willing to pay and he said $50 per month. Stein returned later for the money, and demanded $100 in back pay. Kennedy said he could not pay it, and Stein replied that he could pay a little on it. Kennedy offered a check but Stein refused it. Kennedy tried unsuccessfully to get the check cashed, and Stein said he would come again later. He came later; Kennedy told him that the federal officers were raiding, and that he believed he would quit. In response, Stein said that he could not do anything with the federal officers, but that if any of the other officers raided Kennedy would be notified. In the course of the conversation Stein said he was doing this for Lew. Forces from Wilder's office raided Kennedy's place of business twice in the summer of 1935. They got some whiskey on one occasion, but did not get his still. Kennedy pleaded guilty in 1932 to a violation of the national prohibition law, 27 U.S.C.A. § 1 et seq.; and he pleaded guilty in 1936 to a violation of the Revenue Act. He was given a suspended sentence in the first case; he was placed on parole in the second; the parole was revoked in 1938 for further misconduct; and he was serving a sentence in the federal prison at the time he testified in this case.

Sam Brewer was engaged in the manufacture of liquor in an unregistered still. He had several conversations with Stein. Stein told him to be careful and not get arrested, and that later the two could make

some money together. Stein said on one occasion that they received reports that he was selling whiskey to women. He advised him to quit selling to women and to go into the wholesale business. Brewer was arrested twice before Wilder became sheriff in 1935 and twice afterwards. Following the first raid in 1935, a complaint was filed against him in the county court; he entered a plea of guilty, and was sentenced to serve thirty days in jail and to pay a fine of $50. At the time of the second arrest, one of Wilder's deputies told him that he heard he had been talking, and that was the reason for the arrest. He told Brewer to come to Sapulpa for court and that he thought it could be fixed up. Brewer went to Sapulpa and told Wilder that they had caught his still. Wilder said he did not have any sympathy for him and that he was going to file charges against him. Brewer said he would make bond and Wilder told him he could not do so that day for the reason that there was not anyone in town to approve it. Brewer then went to the office of the county attorney and took his bondsmen with him. He made substantially the same statement to the county attorney that had been made to Wilder. The county attorney directed him to go home and that he would be called when wanted. The record fails to show whether anything further was done concerning the matter.

Joe Allensworth operated a filling station near Bristow, and his brother Labe Allensworth assisted him. Stein stopped there several times, the first being in August, 1935. He inquired how they were getting along and whether he could do them any good. He did not explain what he meant but Allensworth took for granted his meaning. Stein came again about five months later and Allensworth gave him $35; and he returned later and Allensworth told him that he could not do him any good. A repairer engaged in repairing a slot machine in the rear room of the station overheard a statement made in the front room that the person speaking "could have it fixed where they wouldn't be troubled"; but no amount was mentioned. A few minutes later the repairer stepped out in front of the station, saw Stein walk out and get in an automobile, and then knew that it was Stein who made the statement. On one occasion Labe Allensworth overheard a part of a conversation between his brother and Wilder at the station, in which Wilder stated that

they were running a nice place, and that they would have to get on the right side with him. Joe Allensworth had a retailer's stamp issued by the United States, and it was posted in his place of business. He testified that they sold only taxpaid liquor, and that on one occasion he gave deputies Brumley and Chandler liquor to drink; but his brother testified that they sold both taxpaid and moonshine liquor. State operatives raided the place in 1936, and a case growing out of the raid was pending against Labe Allensworth at the time this case was tried; but members of the sheriff's force of Creek County never raided the place at any time. Ruby Arrington was engaged in keeping house in 1935, but she had been connected with an inn at which sandwiches, beer, and taxpaid liquor were sold. Sometime in 1935, one Robinson and Wilder came to her place. Robinson wanted to rent the place. He did not say at that time the purpose for which he wanted it, but did later when Wilder was not present. About a year later Stein demanded money from her and said he must have $35; she stated that she was not doing anything, and that he would have to talk with Wilson as he was running the tavern. Wilson had leased the place from her and she apparently was working there. Wilson went to Sapulpa and told Stein that he would have some money for him on the following Monday. Stein came on Monday and Wilson gave him $35; he came later and received another like sum; and he came a third time, but there is no indication that he received anything on that occasion. A deputy under Wilder told Wilson that all beer parlors would be required to close at twelve o'clock on Saturday nights, and that the county attorney had said he must close at that time; but he remained open beyond that time on a subsequent occasion, and the county attorney and the deputy came to his place on Monday morning and told him that if he failed to close at twelve o'clock his place of business would be padlocked. He then went to see the county attorney and Wilder, and was told that he could remain open until two o'clock in the morning. Wilson talked with Wilder once in regard to hiring several men at another tavern he operated; Wilder telephoned him on one occasion to discharge a certain employee because he was a drunkard; Wilson inquired who should be employed; Wilder recommended two men; Wilson employed them; they claimed to

have deputy commissions; and they told him that he would not be running three days if he discharged them—that the county attorney had so stated. Wilson sold only taxpaid liquor under a retail stamp issued by the United States which he kept posted.

T. L. (Doc) Embry was engaged in the sale of taxpaid liquor in 1935, but did not sell illicit liquor. He had a conversation with Stein in January of that year—soon after Wilder became sheriff—in which he inquired what Wilder was going to do in regard to Embry and others engaged in the sale of whiskey at Sapulpa. Stein told him to go ahead, and that he and others would have to organize and pay off. Stein inquired whether he had an automobile and sufficient money to handle a wholesale business, to which he replied that he did not know whether he would be able to do it. He continued to sell whiskey; Wilder telephoned him about February first to come to the sheriff's office; he went and Wilder asked him what the boys were going to do; he replied that he did not know; and Wilder then said that they would have to get busy and get together. John Whitwell, holder of a retailer's stamp issued by the United States, told Harve Higgins that Wilder wanted $15 a case; that it was too much; and suggested that Higgins see if Wilder would not come down to $6. Higgins talked with Wilder and told him that he was asking too much. Wilder told him to get the boys together for a meeting and have them agree on $6 per case. The separate conversation which Embry and Higgins had with Wilder apparently took place on the same day; and the two with three others held a meeting later in the day, at which it was agreed to raise the price of whiskey twenty-five cents per pint; that Whitwell was to handle the liquor; that others engaged in the sale of liquor were to pay him $6 per case extra; and that he was to pay that amount to Wilder. After that meeting Higgins and Whitwell brought a load of whiskey from Missouri and stored it in Sapulpa, a small part of it was sold to Embry, and the balance was retailed in smaller quantities; but there is no evidence that any money was paid to Wilder or Stein as the result of the meeting.

Walter J. Schaffer operated a restaurant and inn near Drumright, in Creek County. He had a retailer's stamp issued by the United States and sold only taxpaid liquor. Stein came there about June, 1935, and demanded money; Schaffer paid him $50; and he made subsequent monthly payments aggregating $700 or $800. On the night following the first payment, deputies under Wilder raided the place and a complaint was filed. Some time thereafter Stein told Schaffer that his automobile broke down. Deputies under Wilder raided the place a second time but did not find any whiskey. The search warrant in each instance was faulty and Schaffer was not convicted on either charge. S. E. Riley conducted a restaurant in Sapulpa. He had a retailer's stamp issued by the United States and sold taxpaid liquor. While drinking a cup of coffee in the restaurant sometime in June, 1937, Stein demanded some money "to take to the boys upstairs". He returned the following day and was paid $35.

B. H. Carlisle had a conversation with Wilder in May, 1935, in which it was agreed that he could handle liquor in Creek County upon payment of fifty cents per case. Nothing was said concerning the purpose of the payment but everyone was supposed to understand. Carlisle was told to make payment to Stein, but he did not remember who told him to do so. He went into business with a stock of taxpaid liquor worth $5,000; the liquor house was operated under a wholesale dealer's stamp issued by the United States to an associate of Carlisle; Wilder kept a representative there at his own expense to check things; and Carlisle paid Stein $350. Some special deputies under Wilder and a constable raided the place in June, July, or August, 1935; the liquor was seized; and another associate of Carlisle was arrested, convicted in the county court of Creek County, and sentenced to serve six months in jail and to pay a fine of $500. He gave bond after conviction, left the state, and had since been a fugitive from justice in that county.

Stein asked John P. Hill in 1937 whether he was making whiskey or had any on hand. Hill replied that he was making it occasionally, but did not have any then. Stein then said that he was working out of the sheriff's office, and that Hill had better come to see him if he intended to make whiskey. But there is no evidence that any money was paid.

The constable at Oilton aided investigators in the Alcohol Tax Unit of the Treasury Department in making raids upon certain places near that town. Wilder

later asked him why the cases should be taken to the federal officers, suggested that they be brought to the county attorney, and stated that if the constable could not handle them alone to call on any of Wilder's deputies and that they would assist him; and Wilder further told him to be careful or he would become a bigger heel than a former constable had been. Investigators in the Alcohol Tax Unit received assistance from certain constables and police officers in Creek County, but none from the sheriff's office. However, they did not ask either the sheriff or any of his deputies to co-operate with them in the enforcement of the internal revenue laws relating to the manufacture, possession or sale of intoxicating liquor. One of them gave as the reason for their failure to request such co-operation information which had been received.

Stein frequently visited various beer gardens near Bristow, Drumright, and Oilton. He usually remained inside fifteen or twenty minutes, but his negro chauffeur did not know what he did at them. He went to the home of Wilder on one occasion about two years before the time of the trial. Wilder had been injured in a wreck and Stein went to see him. Stein and Wilder had a conversation on the road near the ball park in Sapulpa. The road was Wilder's direct route from his. home in Keifer to Sapulpa. On meeting they stopped and conversed, but no testimony was offered concerning the substance of the conversation. These were the major facts and circumstances relied on below and urged here. Evidence was submitted bearing upon others, but they were of secondary importance.

Wilder testified. He denied much of the evidence submitted on behalf of the Government; and he offered other testimony which tended to corroborate his own in certain respects. Deputies Brumley and Chandler testified, and they offered other evidence in their behalf. Stein failed to submit any evidence.

■ Section 37 of the Criminal Code, 18 U.S.C.A. 88, makes it a crime to conspire to commit an offense against the United States. The crime of conspiracy is two or more persons combining or confederating with the purpose of committing a public offense. The crime is distinct from the offense which the parties intend to accomplish as the result of the conspiracy; and it is complete upon the forming of the agreement and the performing of at least one overt act in furtherance of the unlawful design. Callan v. Wilson, 127 U.S. 540, 8 S.Ct. 1301, 32 L.Ed. 223; Clune v. United States, 159 U.S. 590, 16 S.Ct. 125, 40 L.Ed. 269; Williamson v. United States, 207 U.S. 425, 28 S.Ct. 163, 52 L.Ed. 278; United States v. Rabinowich, 238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211; Marcante v. United States, 10 Cir., 49 F.2d 156; Booth v. United States, 10 Cir., 57 F.2d 192; Di Bonaventura v. United States, 4 Cir., 15 F.2d 494. The agreement may be to do an unlawful act, or to do a lawful act in an unlawful manner or through unlawful means. Pettibone v. United States, 148 U.S. 197, 13 S.Ct. 542, 37 L.Ed. 419; Duplex Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; Truax v. Corrigan, 257 U.S. 312, 42 S.Ct. 124, 66 L.Ed. 254, 27 A.L.R. 375; Marino v. United States, 9 Cir., 91 F.2d 691, 113 A.L.R. 975; Maryland Casualty Co. v. Hosmer, 1 Cir., 93 F.2d 365.

■ And the agreement need not be in any particular form. It is enough if the minds of the parties meet in an understanding way with the single design to accomplish a common purpose; and the union of the minds may be proved by circumstantial evidence. Proof of an agreement in writing or in formal words is not necessary. The agreement may be inferred from statements, acts and circumstances. Cases abound enunciating the doctrine that a conspiracy is frequently not susceptible of direct proof, and may be established by circumstantial evidence. Parnell v. United States, 10 Cir., 64 F.2d 324; Telman v. United States, 10 Cir., 67 F.2d 716; Brayton v. United States, 10 Cir., 74 F.2d 389; Jaramillo v. United States, 10 Cir., 76 F.2d 700; Marx v. United States, 8 Cir., 86 F.2d 245; Marino v. United States, supra; Robinson v. United States, 5 Cir., 94 F.2d 752.

■ An appellate court does not weigh evidence. It merely determines whether there was substantial evidence to support the verdict. And in determining that question the evidence and the inferences and deductions reasonably to be drawn from it must be viewed in the light most favorable to the Government. Zottarelli v. United States, 6 Cir., 20 F.2d 795; Rosser v. United States, 4 Cir., 75 F.2d 498; Walker v. United States, 8 Cir., 93 F.2d 383, certiorari denied 303 U.S. 644, 58 S.Ct. 642, 82 L.Ed. 1103; Meyers v. United

States, 6 Cir., 94 F.2d 433; Diehl v. United States, 8 Cir., 98 F.2d 545.

 It is unnecessary to express an opinion here as to whether the evidence proved a conspiracy to violate the laws of the State of Oklahoma prohibiting the manufacture, possession, or sale of intoxicating liquor and to prevent the enforcement of such laws as it is the province of the courts of the state to determine that question. But county officers and their deputies do not bear any official duty by virtue of their positions to enforce the internal revenue laws of the United States. And their mere failure to enforce such laws or to prevent a conspiracy to violate them, without more, is not enough to support a conviction upon a charge of violating section 37 of the Criminal Code, 18 U.S.C.A. § 88. It is necessary to prove that they consented in some affirmative way to become a party to the concert of action. Weniger v. United States, 9 Cir., 47 F.2d 692; Rossi v. United States, 9 Cir., 49 F.2d 1.

 The evidence relating to the conversations and contacts which Stein had with Wilson, Embry, Schaffer, and Riley, and those which Wilder had with Wilson, Embry, and Whitwell had no probative force whatever in establishing the crime laid in the first count of the indictment for the reason that each of those persons had a retailer's stamp issued by the United States and they sold only taxpaid liquor. Since they severally had stamps and sold only taxpaid liquor it was not possible under any conceivable view of the evidence for the jury to draw the inference or deduction that the conversation and contacts with them tended remotely to show concert of action to violate the revenue laws of the United States. Likewise, Jose Allensworth had a retail dealer's stamp and he testified that he sold only taxpaid liquor, while his brother testified that they sold both taxpaid and untaxpaid liquor. Carlisle engaged in business as a wholesaler. He did not have a stamp, but one of his associates in the business had a wholesale dealer's stamp. Kennedy did not have a stamp. But the Government tendered him as a witness, and according to his undisputed evidence when he told Stein that the federal officers were raiding and that he believed he would quit, Stein replied that he could not do anything with the federal officers but that if any other officers raided Kennedy would be notified. It further appears from the undisputed testimony of Emma Foreman, a witness offered by the Government, that when she stated to Wilder she could not pay Stein the money demanded he told her that it was her hard luck and that she had better quit; and it further appears from the undisputed testimony of Brewer, a witness offered by the Government, that when he told Wilder his still had been captured, Wilder replied that he had no sympathy for him and was going to file charges against him. Viewed in the light most favorable to the Government, no substantial evidence was adduced to show that these appellants formed a conspiracy or aided others in carrying out one to violate the laws of the United States relating to the manufacture, possession, or sale of intoxicating liquor. Laying aside the question whether they acted together in extorting money from others for protection against prosecution under the laws of the state or otherwise participated in a concert of action to prevent the enforcement of such laws, there was no substantial evidence from which it reasonably could be inferred or deduced that they formed or furthered an agreement or understanding, express or implied, having for its object and purpose the violation of the laws of the United States.

Strong reliance is placed upon the recent case of Diehl v. United States, supra, to sustain the contention that the evidence was sufficient to support the verdict. It was held in that case that the evidence sustained the verdict against a police officer. There the officer entered into an agreement with Repple to protect him in the sale of illicit alcohol and was paid a monthly sum. But the officer did not stop there. He told Buckhannon that he would put him in touch with some people who could do him "some good"; and he later introduced Buckhannon to Repple and an associate in the alcohol business. Repple then furnished Buckhannon an automobile and alcohol, and Buckhannon sold the alcohol. No comparable facts were present here. There was no evidence indicating even remotely that these appellants introduced persons or otherwise brought them together for the plainly understood purpose of enabling them to act in concert in the sale of liquor in violation of the revenue laws of the United States.

The judgments are severally reversed and the causes remanded.