251 F.2d 288
 Jay L. JONES, Paul J. Livingston, Jack Gott, Leo Brantley Jackson, Johnny E. Cole, James Richard Harp, William Thomas Peterson, Oliver B. Stephens, John E. McAfee, T. Martin Edwards, Elmer Lee Oakley, John David Hood, F. Lee Johnson, Paul Donley Rucker, Fred A. Griffing and Don Gray, Appellants,
v.
UNITED STATES of America, Appellee.
 Nos. 5678-5693.
 United States Court of Appeals Tenth Circuit.
 January 6, 1958.
 Rehearing Denied January 21, 1958.
 Writ of Certiorari Denied March 31, 1958.
 
 See 78 S.Ct. 703.
 Irvine E. Ungerman, Tulsa, Okl. (Charles A. Whitebook, Manuel Grabel, Maynard I. Ungerman, William Leiter, R. James Unruh, James F. Metzer, Tulsa, Okl., and A. L. Shortridge, Joplin, Mo., were with him on the brief), for appellants.
 B. Hayden Crawford, U.S. Atty., Tulsa, Okl. (Russell H. Smith, First Asst. U.S. Atty., John Morley, Asst. U.S. Atty., Tulsa, Okl., and Hubert A. Marlow, Asst. U.S. Atty., Northern District of Oklahoma, Nowata, Okl., were with him on the brief), for appellee.
 Before BRATTON, Chief Judge, and PICKETT and LEWIS, Circuit Judges.
 PICKETT, Circuit Judge.
 
 
 1
 The appellants were charged in a two count indictment with conspiring to violate the laws of the United States. The first count alleges that the appellants, with others, conspired to import intoxicating liquor into the dry state of Oklahoma in violation of 18 U.S.C.A. § 1262. The second count charged a conspiracy by the defendants to carry on the business of wholesale and retail liquor dealers without paying the special tax required by 26 U.S.C.A. § 5691. Each count set forth that the conspiracy continued from about January 1, 1948, to approximately February 21, 1957. At the conclusion of the trial the court found that the evidence was insufficient to establish a conspiracy prior to March of 1956. Motions for judgments of acquittal for all the defendants except the appellants were sustained. The case was submitted to the jury limited to the question of whether a conspiracy existed in March of 1956 and thereafter. All appellants were found guilty on the first count and only the defendants T. Martin Edwards and John David Hood were found guilty on the second count. Each defendant was sentenced on the first count to be imprisoned for one year and to pay a fine of $1,000. T. Martin Edwards and Hood were sentenced to serve a term of one year on the second count, to run concurrently with the sentence received on the first count. All the defendants convicted have appealed.
 
 
 2
 One of the principal grounds for reversal is that the evidence does not establish the existence of a conspiracy to violate Federal laws. The Federal Statute makes it a crime to conspire to commit an offense against the United States. The offense is complete when two or more persons combine together to commit an offense against the United States and do any act to effect the object of the conspiracy. 18 U.S.C.A. § 371; O'Neal v. United States, 10 Cir., 240 F.2d 700, 701. "In determining [the question of] the sufficiency of the evidence to support a verdict, the inferences to be drawn therefrom are viewed in the light most favorable to the prosecution." O'Neal v. United States, supra; Seefeldt v. United States, 10 Cir., 183 F.2d 713; Wilder v. United States, 10 Cir., 100 F.2d 177. The agreement need not be in any particular form. By its nature it is seldom susceptible of direct proof. Ordinarily conspiracies can be established only by the acts and conduct of the conspirators and the inferences to be drawn therefrom. Butler v. United States, 10 Cir., 197 F.2d 561. Generally convictions will be sustained if the circumstances, acts and conduct of the parties are of such character that the minds of reasonable men may conclude therefrom that an unlawful agreement exists. O'Neal v. United States, supra; Heald v. United States, 10 Cir., 175 F.2d 878, certiorari denied 338 U.S. 859, 70 S.Ct. 101, 94 L.Ed. 526; Young v. United States, 10 Cir., 168 F.2d 242, 245,[1] certiorari denied 334 U.S. 859, 68 S.Ct. 1533, 92 L.Ed. 1780.
 
 
 3
 A summary of the evidence discloses that early in the year 1956 the defendant Jones was a candidate for election to the office of Police and Fire Commissioner for the City of Tulsa, Oklahoma. Sometime during the latter part of February or early in March, Charles Hirrlinger and the defendant McAfee met, at which time McAfee stated that he believed that he could work out a vice protection deal if they could get Jones elected, but it would cost four or five thousand dollars. Shortly thereafter, Hirrlinger and McAfee met with Jones, and it was agreed that Hirrlinger would talk to Bill Edwards about raising the money. Following these meetings there were numerous conversations between the different individuals above named, and substantial sums of money were delivered to Jones. Bill Edwards was then, and had been for many years, one of the principal importers of intoxicating liquor into the City of Tulsa, substantially all of which was disposed of at wholesale. Sometime in March Bill Edwards, Hirrlinger and McAfee discussed in detail what the organization should be, including the division of the income received from the protection payoff.[2] A few days before the election on April 3, 1956, Bill Edwards, Hirrlinger and Jones met secretly. Jones stated that he intended to make some money if he won the election. The meeting was for the purpose of raising money immediately for the election expenses of Jones and to talk about an organization for the collection of money from those engaged in the liquor, gambling and prostitution business within the City of Tulsa after the election. At that time Jones was given $700. He shook hands with Bill Edwards and told him that if he were elected, Edwards would be in control of the liquor business in Tulsa. Jones suggested that he should meet in the future only with Hirrlinger and that it was not a good idea for all of them to get together too often. Prior to the election Edwards received $200 from the defendant Lee Johnson, and $900 from three Massey brothers, which was delivered to Jones. Johnson and the Massey brothers were liquor dealers, and it was understood that if Jones were elected, they were to be given credit for these payments on any exactions which were required thereafter.
 
 
 4
 Jones was elected, and took office on May 8, 1956. In the latter part of May, Bill Edwards and Hirrlinger met with the defendants Jones, Livingston, Gott, and McAfee, at Hirrlinger's home near Tulsa for the purpose of completing the control and payoff arrangements. Livingston had been appointed Chief of Police and Gott was a long-time head of the Tulsa police vice squad. McAfee was a billiard hall operator in Tulsa. At this meeting specific arrangements were made to require payments from persons who were selling intoxicating liquor, engaging in gambling or prostitution operations. Livingston was the spokesman at this meeting and the division of the money to be realized was drastically changed from the original understanding. The principal difference was a division of 20% each to Livingston and officer Gott, 40% to Jones, and a reduction to 10% for Bill Edwards, Hirrlinger and McAfee together. Bill Edwards was to take charge of the liquor operations, McAfee the gambling, and Hirrlinger the prostitution activities. As to the payments to be exacted from the liquor dealers, Bill Edwards testified that he was to contact the bootleggers and let them know that he was in a position to help them in their business if they would cooperate. The cooperation included the payment of $100 per month. Those operating places known as "walkins" were to pay a minimum of $250 per month. They were told that those who did not make the payments would be reported to the police vice squad for raiding and arrest. The vice squad would be given the information regarding those who paid, including a complete description of their cars. They would not be molested by the vice squad, but given a free range. The liquor dealers were assured that price cutting activities were not to be tolerated. It was understood that if the required payments were not made, the vice squad should take necessary and appropriate action to put them out of business.
 
 
 5
 Early in June, 1956, Bill Edwards, Hirrlinger, Jones, Livingston, Gott and McAfee met again. At this meeting Livingston, who seemed to assume the leadership in the scheme, insisted that Bill Edwards' brother Martin be allowed in on the deal. There was bitter feeling between Bill Edwards and his brother, who was also an importer of large quantities of liquor into Tulsa. Bill objected strenuously, even to the extent of saying that if his brother was in, he was out. The question was put to a vote, and Bill Edwards was the only one who voted to keep Martin out. No immediate action was taken to include Martin. There were numerous meetings of different individuals of this group thereafter, from which emerged the contemplated systematic plan for obtaining money from those in the liquor business, and other businesses, in exchange for protection to be furnished them in their illegal activities. During all this time Bill Edwards had authority to determine which liquor dealers would be permitted to buy protection and which would not. He exercised his authority city-wide. He was in position to give instructions directly to members of the police vice squad or through Jack Gott. They followed instructions or were removed. He did not require the liquor dealers to buy liquor from him, but he testified that under the arrangement he had all the business he could handle and didn't have room for any additional. He also had the power to cut a liquor dealer off if he refused to trade with him. During this time, for the purpose of carrying out the agreement, Bill Edwards made substantial collections from different liquor dealers. If anyone who had been paying was raided, he was to get his money and liquor back. When liquor dealers felt they were not getting the promised protection and that the non-paying dealers were not being properly taken care of by the vice squad, they complained to Bill Edwards. All of the collections, including those from gambling and prostitution, were pooled, and 90% of it was turned over to Gott for distribution under the arrangement.
 
 
 6
 During this period the wholesale liquor business of Bill Edwards flourished. He made almost daily purchases of large amounts of liquor from the defendant Gray, who operated wholesale liquor stores in Missouri near the Oklahoma state line. Most of these purchases were transported to Tulsa in automobiles with special equipment on them. In July, 1956 Livingston prevailed and Bill Edwards was replaced by his brother Martin, who took charge of the liquor business with little change in the existing procedure. Martin made the collections personally or by a designated agent. About the same time, Hirrlinger quit the organization.
 
 
 7
 The record so clearly establishes a conspiracy and acts to effectuate it, that further discussion is unnecessary. We also think that the evidence shows that the combination from its inception contemplated the unlawful importation of intoxicating liquor into Oklahoma. Bill Edwards, who was in charge of the liquor end of the deal, had been for many years one of the principal importers of intoxicating liquor into Tulsa. When he was ousted, at the insistence of Livingston, his replacement was also a known importer of liquor. Without imported liquors, the combine would have had no liquor business to control in Tulsa.
 
 
 8
 As to the second count, there is no evidence in the record from which it may be inferred that the failure to pay the statutory tax for carrying on the business of wholesale or retail liquor dealer had anything to do with the conspiracy or was even considered at any time by the conspirators. There was evidence of substantive violations, but none of conspiracy. The second count should not have been submitted to the jury as to any of the defendants.
 
 
 9
 The appellants contend that, considering the evidence in the light most favorable to the prosecution, all that is shown is a conspiracy to protect bootleggers from raids and prosecution by city officials which brings the case within the rule of Wilder v. United States, supra. In the Wilder case it was charged that the conspirators agreed to engage in the business of distilling whiskey at various places without furnishing the bond required by Federal law, or paying the required tax. The defendants, who were state officers, exacted payments from the still operators for being allowed to continue their business. Referring to the conduct of the officers, the court said [100 F.2d 183]: "their mere failure to enforce such laws or to prevent a conspiracy to violate them, without more, is not enough to support a conviction upon a charge of violating * * *" the Federal Conspiracy Statute. The court continued that it was "necessary to prove that they consented in some affirmative way to become a party to the concert of action." Therein lies the distinction between the Wilder case and this case. Here it was not a matter of inaction on the part of the city officials Jones, Livingston and Gott. They were the original conspirators, along with Bill Edwards, Hirrlinger and McAfee, in developing and carrying out this sordid arrangement which included the taking of money from dealers in intoxicating liquor in Tulsa, who necessarily were to sell liquor imported into Oklahoma. The fact that Jones, Livingston and Gott were city officials, sworn to enforce city ordinances, does not prevent them from conspiring to violate the laws of the United States.[3] The inference is inescapable that it was understood that a substantial portion of the liquor disposed of in Tulsa was to be imported by one of the conspirators, who was authorized to designate the local retail liquor dealers who were to be protected. The case is more like Briggs v. United States, 10 Cir., 176 F.2d 317, certiorari denied 338 U.S. 861, 70 S.Ct. 103, 94 L.Ed. 528, rehearing denied Payne v. United States, 338 U.S. 882, 70 S.Ct. 158, 94 L.Ed. 541, and Parnell v. United States, 10 Cir., 64 F.2d 324, than Wilder.
 
 
 10
 As to the other defendants, the question remains whether they, knowing of the conspiracy, entered into it. A person does not become liable as a conspirator unless he knows of the existence of the conspiracy, agrees to become a party, and with that knowledge commits some act in furtherance thereof. United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128; Laska v. United States, 10 Cir., 82 F.2d 672, certiorari denied 298 U.S. 689, 56 S.Ct. 957, 80 L.Ed. 1407; Skelly v. United States, 10 Cir., 76 F.2d 483, certiorari denied 295 U.S. 757, 55 S.Ct. 914, 79 L.Ed. 1699; Booth v. United States, 10 Cir., 57 F.2d 192. This knowledge and participation may be inferred from the circumstances, acts and conduct of the parties. The evidence is quite clear and without dispute that T. Martin Edwards entered into the conspiracy with full knowledge thereof, made the collections which had theretofore been made by his brother, and also continued his business as an importer of intoxicating liquor which was to be disposed of at wholesale, principally to those who were paying for protection.
 
 
 11
 The defendants Jackson, Cole, Harp, Peterson and Stephens were police officers who were assigned to the vice squad after the formation of the scheme by the original conspirators. The initial plan was that these men were to receive $200.00 per month for their participating in the conspiracy. There was some evidence that they were to get preference in connection with their duties, but there is no direct evidence that any payments of money were made to them or that the other benefits were received. The record is, however, replete with evidence from which it can be inferred that each of them knew of the scheme and assisted in carrying out its purpose. They protected those who paid, and raided the nonconformists when directed to do so by Bill Edwards, T. Martin Edwards or Gott.
 
 
 12
 The defendants Oakley, Griffing, Johnson, Rucker and Hood were liquor dealers in Tulsa. They were informed of the central combination to control the dissemination of liquor in the city and what was required of them if they desired to continue in business. Each accepted the terms and became participants. In discussing a similar situation, in Parnell v. United States, supra [64 F.2d 327], this court said: "The trial jury was justified in finding the conspiracy was formed as charged. It began by a deliberate agreement. The exactions put on the several liquor violators resulted in nothing more than an entry by them into the conspiracy. In other words, they might operate, if they joined in the corrupt liquor scheme. The evidence centers around the still on the Tidwell farm, and it was within the province of the jury to find that transaction was an overt act in furtherance of the conspiracy. Bellah doubtless knew it was on foot when he applied for the privilege of locating a still on that place and paid the protection money for it. There was no separate plan to conspire with different groups. The law violators when informed of the opportunity contributed and became parties to the liquor program in the county."
 
 
 13
 The defendant Gray was an operator of several liquor stores in Missouri. Before and after the scheme agreed upon by the original six conspirators, he sold large quantities of liquor to Bill Edwards and others, which he knew was to be taken into the dry state of Oklahoma. During the time that the conspiracy was in effect, but after Bill Edwards had been ousted, Gray went to Tulsa to confer with Bill Edwards, who had threatened to discontinue purchases from him. So far as the evidence shows, this trip was solely for the purpose of trying to prevent a discontinuance of a business relationship of long standing. The evidence may be sufficient to show that he aided and abetted the importation of intoxicating liquor into Oklahoma, or even conspired with Bill Edwards and others to do so, but there is not a scintilla of evidence that he knew of the conspiracy charged in the indictment and consented to become a party, or knowingly did any act to accomplish its purpose. In Van Huss v. United States, 10 Cir., 197 F.2d 120, we quoted from Direct Sales Co. v. United States, 319 U.S. 703, 709, 63 S.Ct. 1265, 87 L. Ed. 1674, as follows: "one does not become a party to a conspiracy by aiding and abetting it, through sales of supplies or otherwise, unless he knows of the conspiracy; and the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally." Cf. Ritter v. United States, 10 Cir., 230 F.2d 324. Gray's motion for acquittal should have been granted. See Bacon v. United States, 10 Cir., 127 F.2d 985; Marcante v. United States, 10 Cir., 49 F.2d 156.
 
 
 14
 The defendants charge that the United States Attorney was guilty of willful misconduct and gross disregard of his duty, as a representative of the United States, by using methods calculated to deprive these defendants of a fair and impartial trial. This accusation is based upon the claim that many of the witnesses called testified to activities of some of the defendants in relation to prostitution, gambling, graft and corruption in Tulsa, which had no connection with the charge, and that the sole purpose of such evidence was to prejudice the jury against the defendants. We find these intemperate accusations wholly without justification. There is nothing in the record to indicate that the District Attorney acted deliberately and in bad faith. The evidence is without conflict that the conspiracy not only included the control of the sale of intoxicating liquor in Tulsa, but also the control of prostitution and gambling. The income which the scheme derived from each source went into a common pot which was divided according to the agreement.
 
 
 15
 It is elementary that the evidence of other offenses is not admissible in the trial of a criminal offense. This rule is not applicable if the evidence is introduced to prove intent or to show a course of conduct, or tends to prove the crime charged. Baish v. United States, 10 Cir., 90 F.2d 988; Minner v. United States, 10 Cir., 57 F.2d 506; Butler v. United States, 10 Cir., 53 F.2d 800. Control of prostitution and gambling was part of the conspiracy; it was so interwoven with the liquor control established by the conspirators that it was impossible to separate them, but the trial court was extremely careful throughout the entire proceeding in advising the jury as to what extent such evidence should be considered by it. Consequently, no error resulted from the reference by different witnesses.[4] Holt v. United States, 10 Cir., 94 F.2d 90; Metzler v. United States, 9 Cir., 64 F.2d 203. We are satisfied from an examination of this entire record that the court's admonitions during the trial were sufficient to prevent any prejudice from the admission of evidence which was later excluded or not properly connected with the conspiracy.
 
 
 16
 It is contended that as there was only one conspiracy, it was error to indict the defendants on two counts and thereby to submit the case to the jury as though there were two offenses. It is conceded that there was only one conspiracy, but the District Attorney argues that if the unlawful agreement contemplates the commission of more than one offense against the United States, it is proper to plead each offense in a separate count. In view of our conclusion as to the second count, we need not reach the question as to whether a single conspiracy to commit acts in violation of several penal statutes may be pleaded in separate counts and punished as one or several conspiracies. See Braverman v. United States, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23;[5] Williams v. United States, 5 Cir., 238 F.2d 215, certiorari denied 352 U.S. 1024, 77 S.Ct. 589, 1 L.Ed. 596.
 
 
 17
 We find no merit in the assignment of error that the court did not adequately instruct the jury on the basic elements of a conspiracy. The jury was told that the elements of a conspiracy were the willful conspiring together of two or more persons to commit offenses against the United States; that the offense was complete if it appeared from the evidence that any one of the overt acts alleged in the indictment was committed for the purpose of effecting the objects of the conspiracy. We have considered the instructions as a whole, and they cover the applicable law of conspiracy. The duty of the trial court is to instruct on the general principles of the law of the case. It is not required to include in its instructions what is not the law of the case nor to give instructions "in the language offered by the litigants or outline all possible factual situations which would fail to show one's connection with a conspiracy." Butler v. United States, 10 Cir., supra, 197 F. 2d at page 564. See also Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021.
 
 
 18
 We have reviewed this voluminous record in detail and find that the trial court conducted a rather difficult case with extreme care to protect all of the rights of the defendants. We find no error affecting any substantial rights of the defendants except as to T. Martin Edwards, John David Hood, and Don T. Gray.
 
 
 19
 The judgment is affirmed as to all defendants on the first count except the defendant Gray; judgment is reversed as to the defendant Gray and as to the defendants T. Martin Edwards and John David Hood on the second count only.
 
 
 
 Notes:
 
 
 [1]
 In the Young case, the court said:
 "It is well to remember that in the very nature of things, unlawful conspiracies are seldom provable by direct and positive evidence. Ordinarily they must be established by circumstantial evidence, and `it is sufficient if the circumstances, acts, and conduct of the parties are of such character that the minds of reasonable men can conclude therefrom that an unlawful agreement exists.' Garhart v. United States, 10 Cir., 157 F.2d 777, 781. See also Wilder v. United States, 10 Cir., 100 F.2d 177. Nor is it essential that each conspirator participate in or have knowledge of all of the operations of the conspiracy. It is enough if a conspiracy is formed, and the several persons convicted knowingly contributed their efforts in furtherance of it. Berenbeim v. United States, 10 Cir., 164 F.2d 679."
 
 
 [2]
 Bill Edwards testified that it was decided that, after expense, Jones was to receive 50% of the income and the remaining 50% was to be divided equally among the three. The expenses were to include a $500 per month payment to Livingston, Tulsa Chief of Police, and $200 per month to each member of the police vice squad
 
 
 [3]
 The trial court's instruction on this subject correctly states the law. It is as follows:
 "You are instructed that the police officers of the City of Tulsa, Oklahoma, are not under any duty by virtue of their positions to enforce the Federal Liquor Importation Act or the Internal Revenue laws of the United States. The mere failure of police officers of the City of Tulsa to make arrests or raids for the purpose of aiding in the enforcement of Federal laws pertaining to the transportation and sale of liquor would not be sufficient to prove a conspiracy upon the part of such officers to violate those laws. But, if such police officers enter into an agreement to aid and assist others in carrying on the liquor business and knowingly and intentionally cooporate with others in the importation of liquor into Oklahoma in violation of Federal law, or aid and assist others in carrying on the business of either a wholesale or a retail liquor dealer, and wilfully failing to pay the special tax as required by Federal law, then such police officers do commit an offense against the United States."
 
 
 [4]
 Typical of such care by the trial court is the following statement to the jury:
 "* * * I think perhaps I should say to the jury at this point, however, because I anticipate that this same question will arise from time to time, that you should have in mind that the charge made in the indictment with which we are concerned in this case has to do only with an alleged conspiracy pertaining to liquor. That is, an alleged conspiracy to import liquor into the State of Oklahoma in violation of federal law, and to sell both at wholesale and retail without paying the special tax as required by federal law. The indictment does not contain any accusation or any charge with reference to gambling, or any other vice; and any testimony that you hear that pertains to gambling or any other vice — and I might mention the other thing I have in mind because I think we will get to that shortly too — and that is prostitution — any evidence presented in that connection can only be considered, if it is in some way connected up with the alleged conspiracy to violate the liquor law. Evidence pertaining to gambling and other forms of vice is not to be considered only except and in so far as it may hereafter be connected up and shown to have some relation to the charge of the conspiracy to violate the liquor law."
 
 
 [5]
 In the Braverman case the question was whether a single conspiracy to commit acts in violation of several penal statutes should be punished as one or several conspiracies. The indictment was in seven counts. It was held that the precise nature and extent of the conspiracy must be determined by the agreement which embraces and defines its objects. The one agreement cannot be taken to be several agreements. The court did not criticize the indictment, but held that the sentence could be for one offense, and returned the case for resentencing. It appears quite clear that the indictment in the case at bar contained more than one count because some of the objects of the conspiracy constitute felonies and others misdemeanors. The sentences of all appellants are for misdemeanor only